986 So.2d 1093 (2007)
EXXON MOBIL CORPORATION f/k/a Exxon Corporation
v.
ALABAMA DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES et al.
1031167.
Supreme Court of Alabama.
November 1, 2007.
*1097 David R. Boyd and W. Joseph McCorkle, Jr., of Balch & Bingham, LLP, Montgomery; Sam C. Pointer, Jr., Samuel H. Franklin, and M. Christian King of Lightfoot, Franklin & White, LLC, Birmingham; Ernest C. Terry of McGinnis, Lochridge & Kilgore, LLP, Houston, Texas; and Walter E. Dellinger III, John F. Daum, and Charles C. Lifland of O'Melveny & Myers, LLP, Washington, D.C., for appellant.
Troy King, atty. gen.; Charles J. Cooper, deputy atty. gen., and Vincent J. Colatriano, Derek L. Shaffer, and Nicholas A. Oldham of Cooper & Kirk, PLLC, Washington, D.C.; Jere Locke Beasley and J. Cole Portis of Beasley, Allen, Crow, Methvin, Portis & Miles, PC, Montgomery; John T. Crowder, deputy atty. gen., and Robert T. Cunningham, Jr., Richard T. Dorman, David G. Wirtes, Jr., and George M. Dent of Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile, for appellees.
Robin Stead, Noble, Oklahoma, for amicus curiae National Association of Royalty Owners, Inc., in support of the appellees.
William T. Stephens, Montgomery, for the Retirement Systems of Alabama; Mac McArthur, Montgomery, for the Alabama State Employees' Association; and Joseph P. Borg, Montgomery, for the Alabama Securities Commission, for amici curiae the Retirement Systems of Alabama consisting of the Employees' Retirement System of Alabama and the Teachers' Retirement System of Alabama; the Alabama Securities Commission; and the Alabama State Employees' Association, in support of the appellees.
Erik S. Jaffe, Washington, D.C., for amicus curiae Taxpayers Against Fraud Education Fund, in support of the appellees.
Aleta Pillick, asst. atty. gen., State of Alaska, for amici curiae States of Alaska, Oklahoma, West Virginia, Delaware, Illinois, New Mexico, South Carolina, Louisiana, Mississippi, Florida, and Massachusetts, in support of the appellees.
PARKER, Justice.
Exxon Mobil Corporation formerly known as Exxon Corporation ("Exxon") appeals from a judgment in favor of the Alabama Department of Conservation and Natural Resources ("DCNR") and the commissioner of DCNR (hereinafter referred to collectively as "the State") in a declaratory-judgment action filed by Exxon. The State filed a counterclaim in that action alleging breach of contract and fraud in Exxon's performance under certain oil and gas leases. The award exceeds $100 million in compensatory damages (including interest) and $3.5 billion in punitive damages after the trial court ordered a remittitur of $8.3 billion of the punitive-damages award of $11.8 billion.

I. Background
After the discovery in 1979 in Mobile Bay of one of the largest reserves of natural gas ever found in the United States, *1098 Exxon competed with other oil and gas companies in bidding to lease the Mobile Bay natural gas fields from the State. The successful bidder would develop the leasehold and extract from it hydrocarbons for use in its oil and gas business. The lessee would pay the State a royalty on the value of the extracted materials. In anticipation of what was expected to be a major sale of leases, then chief legal counsel of DCNR, Robert Macrory, revised the standard lease form from one whose terms were more favorable to the lessee (i.e., the oil company) to one that was more friendly to the lessor (i.e., the State) insofar as apportionment between the oil companies and the State of the proceeds from the leasehold was concerned. In so doing he devised a uniquely state-friendly lease in an effort to maximize royalty interests for the State.
Until Macrory's revision of the form, most of the standard lease forms used in such situations had been prepared by the oil companies. They included provisions that based royalty payments on the profits the lessee accrued after deductions for the costs of extracting, gathering, treating, and then processing the product into a marketable form. This was often called valuation "at the well" or "at the wellhead." To ascertain the "at the well" value of the product, the old lease forms allowed the lessee to "cost-net," i.e., to deduct gathering, processing, and treatment costs from sales proceeds. The old lease forms also allowed lessees to use gas as fuel for the production process royalty-free, as an "input to production," under a "free use of fuel" clause.
The new lease form was intended to assign those costs the oil companies had previously been allowed to "cost-net," as well as the cost of fuel used in production, to the oil company by requiring that royalties be calculated on the oil company's "gross proceeds" from gas and condensate produced. Thus the royalty provisions of the form lease drafted by DCNR were the "polar opposite" of those in the old standard lease forms.
In 1981 and again in 1984, Exxon successfully bid on and subsequently developed several leaseholds in the Mobile Bay fields, as did several other major oil companies. It executed multiple leases both in 1981 and in 1984; all of those leases were the new standard form lease drafted by DCNR, and all contained substantially identical provisions. Exxon paid a total of $573.3 million in nonrefundable bonuses and agreed to pay royalties based on the production from the wells it drilled in the areas it leased. In 1993, during audits of other oil companies, DCNR took exception to certain of the practices the oil companies used in calculating the royalties payable to the State under the new lease form.
In October 1994, DCNR, the State agency that oversees the leases of the Mobile Bay fields, hired Nancy Cone, a revenue analyst, to administer the receipt of the royalty payments. In a January 1995 letter, Cone advised Exxon of anomalies in the documents supporting Exxon's royalty payments. The anomalies resulted in part from the lack of any State-prescribed reporting format to be used. Exxon and Cone worked together to agree on a reporting format.
Meanwhile, because DCNR lacked confidence in the capabilities of its own audit staff, it began a search for a specialist to audit royalty payments it received from the oil companies under the leases. DCNR was aware in January 1995 that Exxon had not provided the information the lease required, but it did not begin its audit until late in the summer of 1996. The audit brought to the forefront the ongoing disagreement over Exxon's method of calculating royalties. DCNR forwarded to *1099 Exxon its demands for additional moneys, in apparent disregard of the contractual remedies in the leases. In a letter dated February 4, 1997,[1] from James D. Martin, then commissioner of DCNR, to Jim House at Exxon, DCNR stated that Exxon had paid $102,915,386 in royalties for the period beginning October 1, 1993, through December 31, 1995, and that Exxon owed the State an additional $50,495,418. DCNR based its claim on the exceptions summarized in a schedule attached to the letter. Exxon and DCNR maintained an ongoing negotiation regarding the correct interpretation of the leases, but no mutually acceptable settlement was reached.
On July 28, 1999, Exxon sued the State to obtain judicial resolution of the dispute over the method of calculating royalties. The State sued Exxon a day later but dismissed its complaint after it became aware of Exxon's declaratory-judgment action. A month later, the State filed a counterclaim in Exxon's action, alleging breach of contract and fraud, claiming that Exxon had fraudulently underpaid royalties from October 1993, when production began. The State subsequently amended its counterclaim to include a demand for punitive damages. Over Exxon's objection, the trial court realigned the parties, naming the State as the plaintiff and Exxon as the defendant. The trial court denied the parties' motions for a summary judgment without a written order, and the case was tried before a jury.
On December 19, 2000, the jury awarded the State $60,194,174 in additional royalties for the 75-month period from October 1993 through December 1999, plus $27,498,521, representing interest at the statutory rate of 12%. The jury also awarded the State punitive damages of $3.42 billion. The trial court held a Hammond hearing[2] but declined to reduce the damages, and it denied all Exxon's posttrial motions. Exxon appealed. On December 20, 2002, in Exxon Corp. v. State Department of Conservation & Natural Resources, 859 So.2d 1096 (Ala.2002), this Court reversed the judgment and remanded the case, holding that the trial judge had impermissibly admitted into evidence a confidential letter written by Exxon's in-house counsel. This Court denied the State's application for a rehearing, and the trial court set the case for retrial in October 2003.
After a 14-day trial,[3] the jury awarded the State $63,769,568[4] (before interest) in additional royalties for the 111-month period from October 1993 through December 2002. The jury found that $23,449,186 of that amount resulted from Exxon's fraudulent suppression of information relating to royalty payments through February 1997. The jury also awarded the State punitive damages of $11.8 billion. On November 19, 2003, the trial court added $39,235,154 to the compensatory damages representing statutory interest at a rate of 12% and *1100 entered a judgment against Exxon for the full verdict amount of $11,902,827,801.[5]
On December 1, 2003, Exxon requested a hearing to obtain guidance on how to apply the jury's verdict to future royalty computations. On December 5, 2003, the trial court denied Exxon's request and entered an order directing Exxon to pay the royalties "according to the plain, unambiguous language of the leases as reflected in the jury's verdict." Exxon filed posttrial motions for a judgment as a matter of law ("JML") and, alternatively, for a new trial or a remittitur. The trial court held a Hammond hearing to consider whether the punitive damages were excessive. After a two-day hearing on March 11-12, 2004, the trial court granted the motion for a remittitur, reduced the punitive damages to $3.5 billion, and denied the motions for a JML and for a new trial.
Exxon appeals, arguing that its interpretation of the lease provisions should be upheld and that the verdict finding that it had committed fraud and the resulting punitive-damages award should be overturned as a matter of law because of what it alleges is the legal insufficiency of the evidence supporting the verdict.

II. Standard of Review
Exxon contends that the trial court erred in denying its motions for a JML as to the State's breach-of-contract claims and the fraud claim. Exxon also contends that, even if this Court upholds the judgment on the fraud claim, the punitive-damages award is excessive. We recently reiterated the standard of review applicable to a trial court's denial of a motion for a JML:
"`When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).'
"Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003)."
Ex parte Howell Eng'g & Surveying, Inc., 981 So.2d 413, 418 (Ala.2006).
Simply stated, whether the evidence is sufficient to permit submission of disputed factual issues to a jury is a question of law for the court to decide. If the answer to the question is no, then the case should not be submitted to a jury. "The *1101 question concerning the sufficiency of the evidence (i.e., whether it was of such `weight and quality' that the jurors could reasonably infer from it that [the plaintiff] had been defrauded) was a question of law and was therefore for the court to decide. . . ." Phillips Colleges of Alabama, Inc. v. Lester, 622 So.2d 308, 314 (Ala.1993).
The interpretation of an ambiguous provision in a contract is a question of law for the court when, applying rules of contract construction, the court may resolve the ambiguity by staying within the four corners of the contract. Extermitech, Inc. v. Glasscock, Inc., 951 So.2d 689, 694 (Ala.2006). If a contract can be interpreted without going beyond the four corners of the document, the trial court's resolution of the question of law is accorded no presumption of correctness, and this Court's review is de novo. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).

III. Analysis

A. Breach-of-Contract Claims
This litigation is a dispute over the method of calculating royalties due the State on gas and related products produced from State lands under lease to Exxon. The differences in Exxon's method and the State's method result from different interpretations of the new lease form. Specifically, the State sued Exxon seeking additional royalties due for "unpaid volume," deductions taken ("cost-netting"), cogenerated electricity, sulfur production, condensate, and royalty-rate differences ("payout"). The trial court submitted these issues to the jury; the jury returned a verdict for the State and awarded the damages under review here.
The leases define the basis for calculating royalties for each of the applicable products, but the definitions have been interpreted differently, yielding different results. Paragraphs 5, 6, 27, and 29(1) of the leases are applicable to our analysis. Paragraph 5 sets forth the primary royalty obligation for all gas produced from the leased area; paragraph 6 sets forth the contractual payment requirements; paragraph 27 provides the means for resolving any ambiguities in the leases; and Paragraph 29(1) defines the term "payout." The pertinent paragraphs follow:
"5. When production of oil, gas or any other liquid or gaseous hydrocarbon mineral from the leased area is obtained, LESSEE agrees to pay or cause to be paid to LESSOR, during the term hereof, the following royalties:
"(a) The value of _____% of the gross proceeds from all oil, distillate, condensate, gas, natural gasoline, or other product covered by this lease, produced and sold from the leased area at the price received therefor or at the best price realizable in the exercise of reasonable diligence, whichever is higher; however, if any oil or gas is produced from any well drilled, whether or not sold or used off the leased area, LESSEE agrees to pay to LESSOR royalty on the oil or gas produced on the above basis, except that no royalty shall be due for gas produced and flared for well testing purposes."
(Emphasis added.)
Paragraph 5(b) requires the payment of royalties on marketable products made from hydrocarbons removed from the wells as well as on gas used and not sold:
"(b) If gas, of whatsoever nature or kind, ... is used, on or off the leased area, by the LESSEE for purposes (including the manufacture or extraction therefrom of gasoline or other products not covered by the royalty provisions of subparagraph (a) above) other than solely *1102 in the development and operation of the leased area as provided herein, LESSEE shall pay ____% of the net amount realized by LESSEE or affiliate from the sale or disposition of the manufactured or extracted products and ____% of the best price realizable in the exercise of reasonable diligence for all gas used and not sold. On all residue gas sold by LESSEE or affiliate after manufacture or extraction of products, royalty shall be paid under subparagraph (a) in addition to the royalty on manufactured or extracted products.... The phrase `net amount realized' shall be arrived at by establishing the gross sales values of the manufactured or extracted products realized by LESSEE or affiliate and deducting therefrom the reasonable direct costs of manufacture and transportation from the leased area incurred by LESSEE or affiliate."
(Emphasis added.)
Paragraph 5(c), the "in kind" royalty provision, allows the State an option to take its royalty payment in the form of gas or products extracted or manufactured from the leased area:
"(c) ... LESSOR may at its option,... require at anytime or from time to time that payment of all or any royalties accruing to LESSOR under the lease be made in kind. If, and whenever, LESSOR elects to exercise this option to take royalty in kind, LESSEE, shall deliver same to LESSOR either at the leased area or the recycling or processing plant as the case may be, or to the credit of LESSOR in pipelines to which these points are connected, free of costs except as provided for hereinabove."
Paragraph 6 requires that royalty payments calculated in accordance with paragraph 5 be accompanied by affidavits attesting to the veracity of the production and royalty reports. It reads as follows:
"6. Each [royalty] payment shall be accompanied by the affidavit of the LESSEE ... showing (1) the gross amount of production, (2) disposition, and (3) the gross sales value or proceeds received, of all oil, gas or any other liquid or gaseous hydrocarbon mineral, and their respective constituent products, produced from the leased area or acreage pooled therewith. LESSEE shall retain for not less than two (2) years a copy of all documents, records or reports confirming the gross production, disposition and gross sales values or proceeds received, ... and any other reports or records which the State Lands Division may require to verify said gross production, disposition and gross sales values or proceeds received; and all such records shall at all times be subject to inspection and examination by the Commissioner of Conservation and Natural Resources or his duly authorized representative. The LESSEE shall bear all responsibility for paying or causing all royalties to be paid as prescribed by the due date provided herein."
(Emphasis added.)
Paragraph 27 of the new lease form provides that "[i]n case of ambiguity, this lease always shall be construed in favor of LESSOR and against LESSEE."
Finally, Paragraph 29(1) provides:
"(1) As used in Paragraph 5, the word `payout' shall mean `the point in time when the LESSEE has recovered from production, after deduction of state royalty, severance and production taxes, the direct expenses incurred in actually drilling wells on the leased area beginning, for each well, with the spud[6] date *1103 and ending on the date each well is ready to be put into production.' The cost of pipelines and treatment facilities are expressly excluded as recoverable expense items."
At trial, Exxon argued that it had calculated and made the royalty payments in accordance with a valid interpretation of the requirements in the leases. The State argued that Exxon had knowingly failed to pay the amounts required under the leases, that it had knowingly falsified its documentation, that it had knowingly withheld and suppressed supporting information due the State, and that it had taken advantage of the inexperience of DCNR's administrative staff. The State further argued that even if the leases were subject to different interpretations, paragraph 27 provided that such ambiguities were to be resolved in the State's favor.
During its jury instructions, the trial court advised the jury as follows:
"[I]t will be necessary for you to determine from the evidence ... the terms and conditions of the leases; ... [whether] [Exxon] breach[ed] the leases; . . . and ... if you find that [Exxon] breached the leases, then you will determine from the evidence what damages, if any, the State suffered as a result of these breaches."
The jury responded to the charge with a verdict for the State for each claim in the following amounts:
1. Royalty due for unpaid volumes: $15,570,921.
2. Royalty due for improper royalty rates (payout): $12,075,343.
3. Royalty due on deductions taken (cost-netting): $28,112,819.
4. Royalty due on value of cogenerated electricity: $2,953,043.
5. Royalty due on sulfur production: $4,379,048.
6. Royalty due on condensate: $678,394.
The total additional royalties due (the sum of the six awards above) were $63,769,568. Of these damages, the jury completed a blank on the verdict form indicating that it attributed $23,449,186 of the compensatory-damages award to fraud.[7]
The trial court denied of Exxon's motion for a JML and entered a judgment on the jury's verdict. On appeal, this Court, as did the trial court in considering Exxon's motion for a JML, must review the sufficiency of the evidence supporting the jury's damages awards. We must look to the facts, and we "`must review the tendencies of the evidence most favorably to the prevailing party and indulge such inferences as the jury was free to draw.'" Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 73 (Ala.2001) (quoting Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990)).
The State sought damages based on Exxon's failure to calculate its royalty payments in accordance with the lease provisions as the State interpreted the leases. It asserts that Exxon violated the lease provisions by fraudulently deducting costs from its payment of gross proceeds. If, as the trial court has decided, the State's interpretation of the method of calculating *1104 royalties is correct, then the State is entitled to compensatory damages. As noted above, the trial court awarded the State a total of $63,769,568 under the breach-of-contract claims; that amount excluded interest, but included $23,449,186 that the jury attributed to fraud without distinguishing the amount from the compensatory damages for breach of contract.
A brief description of the processes involved in a gas-drilling and production operation will provide perspective for our analysis.
Development costs for producing the natural gas from the Mobile Bay fields are high because the reservoirs under Mobile Bay produce "sour gas," which is predominately methane but which also contains significant quantities of hydrogen sulfide, a toxic and corrosive compound. The hydrogen sulfide must be removed to "sweeten" the gas and allow its transport by commercial pipeline. Exxon performs this process at its Onshore Treatment Facility ("OTF").
Gas is processed at offshore wells and platforms. The wellstream (the flow of substances from the reservoir) is composed of natural gas, saltwater, and diamondoids, a wax-like heavy hydrocarbon. In order to prevent salt and diamondoids from obstructing flowlines and production equipment, Exxon injects into the wells fresh water to dissolve the salt and diesel fuel to dissolve the diamondoids. The resulting mixture is transported by flowlines to the production platform, where, after passing through a "full wellstream" meter, the raw gas is separated out. Exxon samples a portion of the raw gas at separation, applying a "wet/dry" ratio to estimate the volume of gas in production from the full wellstream.[8] When the gas leaves the platform, it passes through a meter that directly measures the volume of the gas itself. Exxon recovers the diamondoid-laden "spent diesel" from the produced liquid stream and sells it at the OTF as "slop oil."
The raw gas is then transported to the OTF, where Exxon removes the hydrogen sulfide to "sweeten" the gas and to allow its transport by commercial pipeline. Exxon performs this process at the OTF, making molten liquid sulfur, which it sells by the truckload. Exxon either sells the sweetened gas locally at the OTF's "tailgate"[9] or delivers it into a pipeline for downstream sale. Exxon also retains a portion of the sweetened gas for its own use as "fuel gas" in operations at the offshore platforms and at the OTF. Since 1999, however, Exxon has obtained most of its fuel gas from a well that produces naturally sweet gas.[10] One use of the fuel gas is to power electric generators. If Exxon generates surplus electricity, it sells this so-called "co-gen" power to Alabama Power Company.

1. Unpaid Volumes
Unpaid volumes account for $15,570,921 of the total award. The auditor hired by DCNR, Saul Solomon,[11] defined "unpaid *1105 volumes" as including both the amount of gas that was understated in the gross volumes reported by Exxon and the fuel produced and used by Exxon. He testified that he uses the full-wellstream-production report to define production and subtracts from that the volumes on which royalties were paid. He then considers that difference to be the "lost gas" portion of the unpaid volume. "Unpaid volume" therefore includes both "lost gas" and fuel gas used in the development and operation of the leased area. According to the analysis provided in Exxon's brief, fuel gas constitutes 56.3% of the State's "unpaid volume" claim, and lost gas accounts for the 43.7% balance.

a. Lost gas
As discussed above, "lost gas" is the gas estimated to exist based on the full-wellstream measurement less the amount of gas accounted for as fuel gas. Exxon's accountant, Dave Borden,[12] confirmed this when he testified at length that there are two issues in the unpaid volume. A portion of Borden's testimony will illuminate and define the dispute:
"One [of the two issues] is fuel and the other is the measurement point. Now, what ... is still in the unpaid-volume claim that the State has is this difference in measurement between the full wellstream meter and the tailgate residue meter at the exit of the plant.
"Q. [By attorney for Exxon:] Okay. And have you calculated  in other words, have you done a calculation to remove that metering measurement issue from the unpaid volume claim presented by the State?
"A. I have. First off, this is Mr. Solomon's analysis. He did an analysis looking at how much of the unpaid volume was attributable to fuel. And in his calculation, he arrived at 53 percent ... of the unpaid volume amount was fuel. And the remaining amount was attributable to other than fuel.
"Q. So to make sure it's clear, does the State's unpaid-volume claim today actually still contain damages that aren't related to the fuel?
"A. Yes, they do.
". . . .
"Q. All right. Mr. Borden, we talked about the COPAS [Council of Petroleum Accountants Societies] guidelines. Do they give some guidance in this measurement issue?
"A. Yes, they do.... [T]hey provide guidance about which meters should be determinative.... [I]n a situation where you have an actual meter like the tailgate residue meter that is more accurate than a projecting meter or an estimated meter like the full wellstream meter, the general guidance  and this is not an all-events type thing, but the general guidance is common sense would tell you that you would look at the most accurate meter. There's general guidance in COPAS when reconciling gas volumes that you start typically at the tailgate of the plant, the residue of the plant, and work backwards towards the source of the gas. That  that's just the way it would typically work, because the tailgate of the plant is where you know what you actually have."
The downstream meters are more accurate in measuring actual gas produced than is the wellstream meter, which measures everything that comes out of the well, providing the basis for an estimate of the *1106 gas content of the mix. The Alabama Oil and Gas Board ("AOGB")[13] refers to the wellstream volume with a wet/dry adjustment as representing a "theoretical production volume." AOGB order No. 2003-68. The monthly sampling at the wellstream meter to determine the wet/dry ratio produces a snapshot in time that is extrapolated over the period of production to determine the dry production. In contrast, the tailgate meter of the dry gas plus any flared gas is a more accurate measure of production than is a projection.
Under paragraph 5(a) of the leases, royalties are due on "gas ... produced ... from the leased area." The tailgate meter measures actual production rather than a "theoretical production volume." Therefore, because there is no allegation that the downstream meters were inaccurate and because any inconsistencies between the full-wellstream meters and the downstream meters can be explained by the difference between the estimated production volume, based on monthly samples, and the direct measurement of the gas by the downstream meters, the State has not put forward substantial evidence indicating that any gas has been lost. Accordingly, we hold the trial court erred in denying Exxon's motion for a JML on this issue. We therefore reverse the judgment against Exxon in the amount of $6,804,492, which is 43.7% of the verdict for unpaid volumes.

b. Fuel gas
The fuel-gas portion of the unpaid volumes deals with the gas that is used in the development and operation of the leased area. The State argues that only gas flared for well-testing is to be royalty-free in accord with paragraph 5(a) and only gas used for "lift" purposes under paragraph 5(d) is subject to a deferred royalty until it is recycled and sold or used in such a manner as to entitle the State to a royalty. Exxon attempts to use the wording of paragraph 5(b) to support its claim that "oil and gas leases customarily allow the lessee free use of fuel to develop and operate the lease." Paragraph 5(b) exempts gas used "on or off the leased area ... solely in the development and operation of the leased area as provided herein." The State counters, arguing that "as provided herein" as used in paragraph 5(b) refers to flared gas and recycled gas mentioned in paragraph 5(d) and to no other gas.
The lease language is clear on the matter of the fuel-gas claim. Exxon should have been aware that there was nothing "customary" about the leases it executed and that its reliance on custom would not prevail. Accordingly, although we conclude that the trial court erred in sending this issue to the jury because the evidence was legally sufficient for the trial court to resolve the issue as a matter of law, we nonetheless affirm the judgment for the State in the amount of $8,766,429, which represents 56.3% of the verdict for unpaid volumes.

2. Payout
The trial court awarded the State $12,075,343 as compensation for "improper royalty rates, payout." The "payout" heading covers two distinct issues. First, the State claims that Exxon misinterpreted the "payout" terms of the leases and *1107 that it underpaid royalties. Second, the State claims that Exxon improperly withheld payment under payout for capital expenses that should not be included in drilling expenses.
The "payout" clause is included only in the leases executed by Exxon in 1984 or later. It allows Exxon to recover its investment in actually drilling wells on the leased areas by allowing payment at lower royalty rates until the recovery of its investment, as discussed above and as defined in the leases at paragraph 29(1), is complete.

a. Improper rates
This rate issue arises because a single reservoir may be covered by more than one leased tract. Because it is not necessary, cost-effective, or environmentally advisable to drill a well on each leased tract to efficiently recover the gas and oil from the single reservoir, lessees are permitted to join several tracts over a particular reservoir as a unit. Production from that reservoir is then allocated on a percentage basis to the various constituent tracts under a plan formalized in a "unit agreement" negotiated with the AOGB and signed by DCNR. This allocation ensures that the owner of the mineral rights of each leased tract will be allocated his fair share of the proceeds, based on his proportional ownership of the mineral rights covered by the unit, as defined in the unit agreement.
In those leases executed in or after 1984 that include provisions for payout, two rates were inserted in the blanks in paragraph 5(a) and paragraph 5(b) of the standard form lease  one payable "until payout" and the other higher rate payable "thereafter." Exxon paid the lower royalty rate on all tracts in the unit, whether or not an individual tract contains a well, until the cost of each well on the unit is recovered. Exxon argues that the wording of paragraphs 5, 17, and 29(1) of the leases permit this interpretation.
Paragraph 29(1) defines "payout" as:
"(1) As used in paragraph 5, the word `payout' shall mean `the point in time when the LESSEE has recovered from production, after deduction of state royalty, severance and production taxes, the direct expenses incurred in actually drilling wells on the leased area beginning, for each well, with the spud[14] date and ending on the date each well is ready to be put into production.' The cost of pipelines and treatment facilities are expressly excluded as recoverable expense items."
Paragraph 17 reads:
"17. In the event the acreage covered by this lease or any parts thereof is pooled or unitized by governmental order with other land, lease or leases in the immediate vicinity thereof (whether State land, Federal land or privately owned land), ... the entire acreage constituting such unit shall be treated for all purposes as if ... included in this lease except that in lieu of the royalties elsewhere herein specified, LESSOR shall receive on production from each of such units the proportion of royalties herein stipulated that the amount of LESSOR's ownership in the mineral interest in the acreage placed in the particular unit involved bears to the entirety of the mineral interest in such unit."
Exxon relies on the words "the entire acreage constituting such unit shall be treated for all purposes as if ... included in this lease" to argue that the method it employs to calculate royalties, i.e., paying at the lower "payout" rate on all tracts in a *1108 unit until the allowable costs of the wells on the unit are recovered, is the correct method for calculating royalties because the terms of the leases apply to the entire unit and not just to the particular acreage on which the well was drilled.
The State argues that paragraph 29(1) specifically limits its terms to tracts on which a well is "actually" drilled, and that Exxon is "exploiting payout" by paying royalties at a reduced rate on production from tracts on which no wells have been drilled.
The meaning of the payout clause in the leases is clear: it permits the recovery of expenses for wells drilled on the leased areas. It is the interplay between the payout clause and the unitization clause that produces two different, but reasonable, interpretations. When a contract is subject to two reasonable but differing interpretations, it is ambiguous. Paragraph 27 of the leases dictates that such ambiguities will be construed in favor of the State. We agree with the trial court when it held: "Well costs shall be used to determine payout only when a well is physically located on a leased area for which there is a payout provision in the lease. No well costs shall be allocated to other tracts/leases for determining payout." Accordingly, we hold that the trial court did not err in denying Exxon's motion for a JML on this claim, and we affirm the trial court's judgment.

b. Capital expenses
The State claims that Exxon improperly seeks recovery under payout in conflict with paragraph 29(1), which expressly excludes from recovery the "cost of pipelines and treatment facilities."
Exxon argues that this Court set out guidelines as to what types of operations constitute "drilling" under Alabama law in Sheffield v. Exxon Corp., 424 So.2d 1297 (Ala.1982). According to Exxon, the Court in Sheffield, adopting Texas law, broadly defined such operations to include "all physical and mechanical aspects of securing oil and/or gas production in paying quantities, including connection of pipelines to the well or the extension of pipeline to some point where the product might be marketed." 424 So.2d at 1302. Exxon has not included its costs for the gathering system and the OTF as payout expenses, but it has included its costs for corrosion-resistant flowlines, which carry the acidic wet wellstream from off-platform well templates to the production platforms and the offshore platforms themselves. Exxon attempts to justify including the costs of these facilities as necessary to put the wells into production and as being within the definition of "drilling" in Sheffield.
The State argues that the drilling operations at issue in Sheffield were different from those at issue here, that this Court did not adopt Texas's definition of "drilling," and that this Court in Sheffield stressed that each case must be considered on its own facts.
Sheffield deals with the issue of how and when "drilling" or "reworking" activity on leased land or on pooled acreage will serve to extend a lease that has otherwise expired. The Court in Sheffield was required to interpret a clause in a lease that provided for the expiration of the lease when certain time periods had passed without the lessee's pursuing drilling or reworking on the leased land. This Court set out guidelines defining "drilling" and "reworking" under Alabama law in that context. It stated: "[W]e intend to express guidelines as to what types of operations constitute drilling or reworking under Alabama law, but with the caveat that each case must be determined on its own particular facts." Sheffield, 424 So.2d at *1109 1302. The guidelines set forth in Sheffield are clearly stated, as is this Court's caveat "that each case must be taken on its own facts. Consequently, a lease agreement may dictate what operations, if any, are necessary to defeat a cessation of production clause." 424 So.2d at 1302. We now state that a lease agreement may dictate what operations, if any, are to be considered "drilling," as does the payout clause of paragraph 29(1) of the leases at issue here.
The leases at issue here clearly provide for recovery of "direct" expenses incurred in "actually drilling wells" and exclude pipelines and treatment facilities from recovery under the payout provision. This claim should have been decided as a matter of law based on the leases. Accordingly, the portion of the judgment of the trial court denying the recovery of expenses for pipelines under the payout clause on this issue is affirmed.

3. Cost-Netting
The jury awarded the State $28,112,819 for deductions taken from the value of gas at the tailgate of the OTF. Exxon asks this Court to decide that the term "gross proceeds" means "gross proceeds net of deductions" and reverse the judgment entered on the jury's verdict for the State. The thrust of Exxon's argument is that any interpretation of the leases that does not value the gas at the leased area renders the value of royalties indeterminate, because industry custom and practice require the establishment of a valuation point for the computation of gross proceeds. Exxon bases its argument on paragraph 5 of the leases, which requires that royalties be paid based on the "value of ____% of the gross proceeds from all ... gas ... produced and sold from the leased area at the price received therefor...." It is true that where royalties are to be paid on the value "at the wellhead," cost-netting is permitted. Usually deductions are made from the gross proceeds using a factor representing the costs of gathering and treating the gas after it has left the production platform, but the leases under consideration here do not provide for valuation at the wellhead.
The State argues that the leases clearly indicate that the term "gross proceeds" does not mean "net proceeds." To support this argument the State compares the two terms as they are used in paragraph 5(a) and paragraph 5(b). In paragraph 5(a) the term "gross proceeds" is used to indicate that no deductions are permissible. In paragraph 5(b), where certain costs are deductible from gross proceeds, the term "net proceeds" is used to identify the proceeds on which royalties are to accrue.
The State next argues that paragraph 5(c) permits the State to take its royalties "in kind" and that gas is to be delivered to the pipelines connected to the OTF "free of costs." Since cost-netting is not permitted on in-kind royalty gas, the State asserts that Exxon's interpretation that cost-netting is permitted on sold or used gas is inconsistent with paragraph 5(c). Of course, just as the amount of dollars to be paid in royalties is disputed, so would the amount of gas to be provided "free of cost"; thus, this argument is hardly dispositive of the issue.
The State further points to paragraph 6, the paragraph controlling the payment procedure under the leases, which requires Exxon to report only the gross volumes and values of gas produced. The State argues that the leases require no reporting of deductions or supporting information because, it argues, the leases envision no deductions to be supported.
We find the language of the leases to be clear  the term "gross proceeds" means "gross proceeds." Although this claim *1110 should have been decided by the trial court as a matter of law and not by the jury, we affirm the judgment against Exxon.

4. Cogenerated Electricity
The jury awarded the State $2,953,043 as unpaid royalties on cogenerated electricity. We affirm the judgment entered on that award.
At issue is Exxon's use of gas to generate electricity used in the operation of the leasehold without paying royalties on the gas. Any excess electricity not used for Exxon's operations was sold to Alabama Power Company. Royalties were paid on the gas used to generate the electricity sold to Alabama Power, but not on the gas otherwise used.
Exxon attempts to justify its position by arguing that paragraph 5(a) requires royalties only on hydrocarbon minerals and their constituent parts, and, it argues, electricity is not such a product. Exxon next argues that paragraph 5(b) requires royalties on products not subject to royalty payment under paragraph 5(a) if the gas is used to manufacture or extract gasoline or other products from the hydrocarbon minerals. Exxon argues that electricity is not extracted from or manufactured from the gas. Exxon points to § 9-17-1(15), Ala. Code 1975, as support for its position. That statute does list hydrocarbon products made from oil and gas, but, although the list does not include electricity, it does not claim to be an exclusive or complete list.
Sixty-five years ago, this Court decided that electricity was, in fact, a manufactured product. That decision rested on precedent that was then 50 years old. The question arose when Alabama Power Company challenged an assessment on certain of its equipment on the basis that the company, as a generator of electricity, was a manufacturing company and the equipment in question was therefore exempt from the assessment. Alabama Power prevailed in the lower court, and the State appealed to this Court. This Court held:
"[T]he question as to whether or not an electric company engaged in the generation, production or manufacture of electricity is a manufacturing corporation is definitely decided and fully settled by this Court in [Beggs v. Edison Elec. Illuminating Co., 96 Ala. 295, 11 So. 381 (1892)]. . . . And we hold that [Alabama Power Company] is a manufacturing corporation."
Curry v. Alabama Power Co., 243 Ala. 53, 59, 8 So.2d 521, 525-26 (1942). To reach this conclusion the Court relied on an analysis of the same question by this Court 50 years earlier:
"`[W]e are constrained to consider and declare an electric light company a manufacturing corporation to all intents and purposes. It is no answer to this argument to say that electricity exists in a state in nature, and that a corporation engaged in the electric light business collects or gathers such electricity. This does not fully or exactly express the process by which such corporations are able to make, sell, and deliver something useful and valuable. The electricity that exists in nature is of a very different quality from that produced by means of machinery. The business in which an electric light company is engaged makes it necessary to invest large capital in the plant; and there is purchased and consumed coal and other materials to produce steam in order to furnish the power for the operation of the machinery. Then there is supplied and operated a complicated system of machinery, like that commonly used in manufacturing establishments, such as boilers, engines, dynamos, shaftings, beltings, etc.; and then, by means of wires, cables, and *1111 lamps, the mysterious power generated by the machinery used from the materials furnished is transmitted, and lights the streets and private houses. But the electric currents that produce these results cannot be said to be "the free gifts of nature, gathered from the air or the clouds." It is the produce of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations. The collection, storage, preparation for market, and the transportation of ice, as found in nature, is not manufacturing, but the production of ice by artificial means is.'"
Curry, 243 Ala. at 57-58, 8 So.2d at 523-24 (quoting Beggs v. Edison Elec. Illuminating Co., 96 Ala. 295, 300, 11 So. 381, 383 (1892)). The Court in Curry also relied on expert testimony from Dr. Arthur St. C. Dunstan, dean of the Electrical Engineering Department of the Alabama Polytechnic Institute (now Auburn University), who "termed the generation of electricity as the conversion of one form of energy into another." Curry, 243 Ala. at 57, 8 So.2d at 523 (emphasis added). Further, the leases require payment of royalties on manufactured products, not on manufactured hydrocarbon products. The gas was converted into electricity, a salable manufactured product subject to the provisions of paragraph 5(b). Accordingly, the evidence presented was legally sufficient as a matter of law to support a judgment requiring payment of royalties on electricity generated for any purpose. Although the trial court erred in sending this claim to the jury, we affirm the judgment on this claim.

5. Sulfur Production
The jury awarded the State $4,379,048 for royalties due on sulfur production. We reverse the judgment on that verdict.
As discussed above, the full wellstream gas includes hydrogen sulfide, which must be removed to "sweeten" the gas. The process requires the extraction of molten sulfur from the deadly and corrosive hydrogen sulfide gas. Exxon sells the resulting sulfur and pays royalties on the net amount realized as required under paragraph 5(b).
The State argues that Exxon should have calculated the royalties not on the profits it makes from selling sulfur, but on the gross proceeds from the sale of sulfur. It argues that the removal of sulfur is not a manufacturing process but a process necessary to "sweeten" the gas and, therefore, that the product should be covered by the gross-proceeds language of paragraph 5(a) and not by the net-proceeds language of paragraph 5(b), as Exxon treats it.
Exxon argues that the sulfur is manufactured from hydrogen sulfide removed from the full wellstream and that it is, therefore, a manufactured product covered under the net-proceeds language of paragraph 5(b). Exxon has deducted from the gross proceeds the noncapital costs of manufacture and has paid royalties only when it realized a profit. Because sulfur is a constituent part of the gaseous hydrocarbon minerals extracted from the well that requires a manufacturing process to produce, we hold that Exxon's royalty calculations are correct and that that determination could have been made from within the four corners of the leases. We find that the trial court erred in denying Exxon's motion for a JML on this issue. Therefore, we reverse the judgment insofar as it awards the State $4,379,048 for additional royalties on sulfur production.

6. Condensate/Slop Oil
The trial court awarded the State $678,394 in royalties due on the sale of *1112 "condensate." As to that award, we reverse the trial court's judgment.
"[C]ondensate is a light oil that is produced with the gas."[15] It also is a term that is undefined in the form lease. Because this dispute involves a product that does not fit any of the descriptions of condensate, we refer to it as "slop oil." The parties agree that the product in question, slop oil, is a mixture of heavy hydrocarbons called diamondoids, which are present in the reservoir, and diesel fuel, which is injected into the gas stream as the well produces. Exxon purchases the diesel and injects it into the wellstream as a solvent to maintain the diamondoids in a liquid state. Without the diesel, the diamondoids would solidify into a wax-like substance and interfere with the extraction of the gas. The diesel-diamondoid mixture is removed from the gas stream and sold as "slop oil" or "spent diesel." According to testimony presented at trial by George Hite, a witness for the State, only the Mobile Bay field experiences the problem with diamondoids. Other testimony confirms that the diamondoids "contaminate[] [the diesel] to such a level that it can't be used for diesel again. It's sold as a lower-grade... slop oil."[16]
Although Exxon paid royalties on the sale of the slop oil, it calculated the amount of those royalties by deducting the cost of the diesel oil injected into the wells-tream and then paid royalties on the net amount realized under paragraph 5(b) as for a manufactured product. The State argues that no deductions are permissible because condensate[17] is specifically mentioned in paragraph 5(a) and is subject to royalties calculated on the gross proceeds. Exxon argues that the diamondoids degrade the value of the injected diesel and that royalties are due only when the volume of diamondoids is sufficient to increase the value of the injected diesel.
Here, both parties agree that for the most part the diamondoids add no value to, and actually degrade the value of, the diesel. Thus, according to Exxon, the diamondoids generate no "proceeds" unless they contribute sufficient volume to allow Exxon to sell the degraded diesel for more than its original cost, in which case Exxon does pay a royalty on the value the diamondoids add to the slop oil. The State does not dispute that Exxon has paid royalties in those circumstances. The State, however, asserts that Exxon must pay a royalty on the gross proceeds, rather than deducting the costs of the other components of the slop oil. The testimony at trial demonstrates that there is no independent value generated by the diamondoids. James A. Griggs, director of the State Lands Division of DCNR, testified that there "probably is no market or may not be a ready market for diamondoids." *1113 Thus, it is not the diamondoids but the degraded diesel fuel that generates proceeds. Paragraph 5(a) requires royalties on the gross proceeds from products, including "condensate," produced and sold from the leased area. Diesel, a constituent part of slop oil, is not produced from the leased area. Although the diamondoids are extracted from the leased area, it cannot be said that the misnamed "condensate" mixture of diesel and diamondoids is produced from the leased area. It is a product described in paragraph 5(b) as "not covered by the royalty provisions of subparagraph 5(a)." By the terms of paragraph 5(b) the product is a manufactured product subject to the royalty provisions of paragraph 5(b) on the net amount realized, as defined therein. Because the State does not dispute that Exxon has paid royalties on the diamondoids when they added value to the injected diesel, and because we find the judgment requiring the payment of royalties on the diesel portion of the slop oil to be unsupported by the leases, we reverse the judgment insofar as it awards the State $678,394 in additional royalties on the sale of slop oil.

B. Fraud Claim
The jury found that Exxon had committed fraud. It attributed $23,449,186 of the breach-of-contract compensatory damages to fraud, and it awarded the State $11.8 billion in punitive damages. The trial court subsequently reduced the punitive-damages award to $3.5 billion.
Exxon advances three reasons for this Court to reverse the judgment finding that it had committed fraud and awarding the punitive damages based on that finding. Exxon argues first, that the State has not proven all the elements of fraud and cites Hunt Petroleum Corp. v. Alabama, 901 So.2d 1 (Ala.2004); second, that § 6-11-21(l), Ala.Code 1975, prohibits punitive-damages awards to the State; and third, that due process under both the United States Constitution and the Alabama Constitution of 1901 bars the State's recovery of punitive damages. If reversal of the fraud portion of the judgment is not feasible, Exxon alternatively presents two reasons for this Court to drastically reduce the punitive-damages award. First, Exxon argues, § 6-11-21(a), Ala.Code 1975, caps punitive-damages awards at three times the compensatory damages in instances, such as here, where there was no physical injury, and Alabama caselaw imposes the same cap where there was no physical injury or outrageous conduct. See Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 184 (Ala.2000)("[we] reduce the ratio of punitive damages to compensatory damages from 15:1 to 3:1; we consider 3:1 an appropriate ratio...."). Second, Exxon argues, the amount of the award violates federal and state due-process guarantees.
The State argues that Exxon's reliance on Hunt Petroleum, a decision issued after the trial in this case, is misplaced. As discussed below, we conclude, as a matter of law, that here, as in Hunt, the State failed to offer substantial evidence of the elements of fraud. The key factors in our decision are two: First, Cone's letter of January 26, 1995, to Exxon and her internal memorandum dated March 24, 1995, clearly show that DCNR had early knowledge of Exxon's position regarding the calculation of royalties, and second, there was no evidence of detrimental reliance by the State. Therefore, the trial court's denial of Exxon's motion for a JML on the fraud claim was improper because the finding of fraud is unsupported by legally sufficient evidence.

1. Analysis
The fraud charged in the State's complaint is misrepresentation, deceit, and/or suppression.
*1114 "`"The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation."'"[18]Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc., 902 So.2d 46, 57 (Ala.2004) (quoting Waddell & Reed, Inc., 875 So.2d at 1160, quoting in turn Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988)(emphasis added)).
When, as here, punitive damages are sought, fraud is statutorily defined to include intent. Section 6-11-20, Ala.Code 1975, titled "Punitive damages not to be awarded other than where clear and convincing evidence proven; definitions," provides:
"FRAUD: An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury."
Ala.Code 1975, § 6-11-20(b)(1)(emphasis added). The record shows that the trial court charged the jury as follows:
"If you are reasonably satisfied from the evidence that Exxon deceived the State by a willful representation of a material fact as true to induce the State to act and that the State did act thereupon to its injury, Exxon is guilty of a deceit which is a legal fraud.
"I further charge you that Exxon's knowledge of the falsehood is an essential element of deceit. A fraudulent or reckless representation of the facts as true, which the defendant did not know to be false, if intended to deceive the plaintiff, is equivalent to the knowledge of the falsehood.
"In order to recover from misrepresentation or fraud, the plaintiff's reliance must have been reasonable under the circumstances. In determining whether the plaintiff's reliance has been reasonable, you may take into consideration all of the circumstances surrounding a transaction including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. A plaintiff has not reasonably relied upon a misrepresentation if the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts before acting on the alleged misrepresentation.
"Underpayment of royalties on a gas lease, whether mistaken, intentional, or in bad faith, does not in and of itself constitute fraud. To find Exxon liable for fraud, you must find that the State has proved all the elements of the fraud claimed. If you find in favor of Exxon on all of the State's breach of contract claims, you must find in favor of Exxon on the State's fraud claim. If you find in favor of the State on the contract claim, that does not mean that you must also find in favor of the State on the fraud claim. These two claims are different and are to be judged by you using the different legal standards that I have given you."
(Emphasis added.)
The elements required to prove a claim of fraudulent suppression as given to the *1115 jury by the trial court are: (1) A duty (on the part of the defendant) to disclose material facts,(2) which are concealed or not disclosed by the defendant,(3) and which induced the plaintiff to act (4) to his injury, (5) resulting in actual damage to the plaintiff.
The trial court further instructed the jury that "[u]nless information is requested, there is no obligation under the law to disclose when, as in this case, parties ... deal with each other at arm's length, and there is no confidential relationship. Under the law, mere silence is not fraudulent in the absence of a duty to disclose."

a. Misrepresentation/concealment of material facts
Exxon was required under the leases to retain for not less than two years all supporting information for the affidavits submitted attesting to gross production and gross sales, and it was aware that its payments and supporting information were subject to audit. The record shows that Exxon continued to provide information relating to production that it was not required to retain beyond the two-year period required by the leases. There is no evidence indicating that Exxon intentionally withheld information. To the contrary, at Exxon's request, Exxon representatives met with Cone in Montgomery on February 27, 1995, after Cone had requested by letter on January 26, 1995, that "information be provided and or clarified on Exxon's monthly royalty detail." Cone documented the substance of that meeting with a March 24, 1995, memorandum to James A. Griggs, director of the State Lands Division of DCNR, with a copy to "Bob Macrory, Assistant Commissioner"[19] of DCNR. That memorandum clearly shows that DCNR was fully aware that Exxon was interpreting the leases differently than was DCNR and that Exxon did not misrepresent itself as being in agreement with DCNR's interpretation or that Exxon intended to comply with the DCNR's interpretation. The same memorandum also clearly shows that DCNR fully intended to audit Exxon for each of the issues on which its claims were based. The State did not present sufficient evidence of concealment by Exxon of its interpretations of the lease language or of its intentions regarding the methodology it used in calculating the royalties.

b. Reliance
As the trial court instructed the jury, an element of fraud is an action by the plaintiff to his injury, commonly known as "detrimental reliance," based on a misstatement of fact, which, when punitive-damages are sought, must be intentional.
The State argues that it relied to its detriment on the alleged misstatements in the reports that Exxon provided by reading them and "trying to determine what royalties the State was owed," and that, but for the misrepresentations, "the State would have altered its budget projections," and, as a consequence, the State's "auditing ability was limited" and it "continually surrendered its valuable gas to Exxon." Nowhere, however, does the State present sufficient evidence showing that it acted on the alleged misrepresentations by changing its position in reliance on them. There is clear and convincing evidence, however, in the form of Cone's memorandum, that the State did know as early as February 27, 1995, that Exxon was not making the royalty payments in *1116 accord with DCNR's interpretation of the leases. The requirement for action on the part of the plaintiff can be met only if the plaintiff does, or does not do, something that the plaintiff would or would not have done but for the misrepresentation of a material fact.
"Reliance requires that the misrepresentation actually induced the injured party to change its course of action. See Restatement (Second) of Torts § 537 (1977) ('The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if ... he relies on the misrepresentation in acting or refraining from action, and ... his reliance is justifiable.')."
Hunt Petroleum, 901 So.2d at 4 (emphasis added). Here the State has proven no detrimental reliance on the allegedly suppressed or misrepresented facts. It continued to accept payments after it was aware that Exxon was calculating royalties under a contrary interpretation of the terms of the leases. It did not avail itself of the contractual remedies it had reserved for itself in paragraph 24 of the leases,[20] and it continued with all other aspects of the leases. Nothing in the record shows that the State advised Exxon that it believed Exxon was in breach of the leases. The State proved no change in its position in reliance on a concealed or misstated fact and has failed to satisfy the detrimental-reliance element of fraud.

c. Actual damage
"In order to succeed on a fraud claim, a party must prove a misrepresentation of material fact, detrimental reliance upon that misrepresentation, and damage occurring as a result of the reliance. Benetton Services [Corp. v. Benedot, Inc.], 551 So.2d [295] at 298 [(Ala.1989)]." Southern Energy Homes, Inc. v. AmSouth Bank of Alabama, 709 So.2d 1180, 1186 (Ala. 1998). An element included in the jury instruction on fraud here was the requirement that the plaintiff suffered actual damage as a result of the plaintiff's action taken in reliance on the misrepresentation.
The State claims that it was damaged, or acted to its detriment, because it "refrained from auditing Exxon earlier, and thereby did not uncover Exxon's fraud until years later," because, the State says, once the alleged fraud was discovered, the State "had to hire expensive outside experts and conduct a more extensive audit... to discover and determine the extent of Exxon's fraud" and because "Exxon's breach deprived the State of its ability to bring a legal action for breach of contract." State's brief at 101.
The evidence and Cone's memorandum of her meeting with Exxon representatives clearly show that the State was aware of the methodology Exxon used in calculating the royalty payments it made on a monthly basis as early as February 27, 1995. The State waited over a year to start its audit, and although the State claims to have refrained from auditing earlier than it otherwise would have, a December 2, 1996, memorandum from the commissioner of DCNR contradicts that claim. The memorandum not only stated that the delay in selecting a natural gas plant audit consultant was "not the fault of any oil and gas company," but it also shows that DCNR was aware at the outset that "oil and gas *1117 company accounting systems were generally not set up to handle royalty payments in accordance with the terms of these leasesrequiring modification. These early observations have been borne out by the preliminary findings of the two audits that have been conducted by our consultant."
The State's claim that it was deprived of the ability to bring a legal action lacks support in the record because the State delayed filing its action for over two years after it received the initial audit reports of the State's auditors and for four years after it became aware in February 1995 that Exxon was not calculating royalty payments in the manner the State thought the payments should be calculated. Further, the State had contractual recourse through paragraph 24 of the leases, which provides a procedure by which the State was to notify Exxon of matters as to which it considered Exxon to be in default. Exxon would then have had 45 days to respond or potentially forfeit its rights under the leases. The State did not offer substantial evidence indicating that it suffered any actual damage as the result of any alleged misrepresentation or suppression by Exxon.

2. Summary
As stated above, the State failed to offer substantial evidence that it suffered any actual damage as the result of any alleged misrepresentation or suppression. Because the evidence does not, as a matter of law, support a finding of misrepresentation, deceit, or suppression as charged, the trial court erred in denying Exxon's motion for a JML on the fraud claim. A court reviewing a ruling on a motion for a JML must determine whether the party that bears the burden of proof has produced substantial evidence creating a factual dispute that requires resolution by the jury. Waddell & Reed, 875 So.2d at 1152. The State bore the burden of proof on its fraud claim, and it did not present substantial evidence that Exxon made any misrepresentations, that the State reasonably relied on any of Exxon's alleged misrepresentations, or that the State suffered damage as a result of that reliance. Consequently, this claim should not have gone to the jury. Our resolution of this issue pretermits our consideration of Exxon's other arguments regarding the punitive-damages award because punitive damages cannot be awarded in this case absent a finding of fraud. See Wholesale Motors, Inc. v. Williams, 814 So.2d 227, 230 (Ala.2001) (requiring "clear and convincing" evidence and a finding of fraud before allowing an award of punitive damages); John Deere Indus. Equip. Co. v. Keller, 431 So.2d 1155, 1158 (Ala.1983) ("Punitive damages are generally not allowed in actions for breach of contract."). We therefore conclude that the trial court erred in denying Exxon's motion for a JML on the fraud claim, and we reverse the judgment on the fraud claim and the award of punitive damages.

IV. Conclusion
The prohibition against punitive damages for breach of contract, even where the breach seems particularly egregious, often results in framing complaints as asserting fraud so that punitive damages will be available. This case is such a case, and the fraud claim has overshadowed the actual cause of action, which sounds in contract. This case has been through two trials, two Hammond hearings, and two appeals to this Court. Four amici curiae (the National Association of Royalty Owners, Attorneys General from Various States, Taxpayers Against Fraud in Education Fund, and Alabama State Agencies) have filed briefs weighing in on the side of the State. The State and each amici urge this Court to affirm the lower *1118 court's judgment on the breach-of-contract and fraud claims. As we have explained above, we cannot affirm when elements of an alleged fraud remain unproven.
In conclusion, we affirm the judgment entered on the $63,769,568 jury verdict for compensatory damages on the contractual issues only in the principal amount of $51,907,634. In all other respects, we reverse the judgment as to compensatory damages. We remand the cause for the trial court to enter a judgment in favor of the State and against Exxon on the breach-of-contract claims and to award compensatory damages, with interest, in an amount consistent with this opinion.
No fraud was proven under Alabama law, and the verdict and punitive damages awarded on the fraud claim should have been precluded by the trial court's entry of a JML for Exxon on this claim. Accordingly, we reverse the judgment in favor of the State on the fraud claim, and we instruct the trial court on remand to enter a judgment in favor of Exxon on the State's fraud claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
WOODALL and STUART, JJ., concur.
SMITH and BOLIN, JJ., concur specially.
SEE and LYONS, JJ., concur in part and concur in the result.
MURDOCK, J., concurs in the result.
COBB, C.J., concurs in part and dissents in part.
SMITH, Justice (concurring specially).
I concur with the main opinion; I also join part II of Justice See's special writing entitled "Fraud."
BOLIN, Justice (concurring specially).
I concur with the main opinion in all respects. I also join part II of Justice See's special writing entitled "Fraud," in which he discusses the State's failure to produce substantial evidence of any misrepresentations on Exxon's part and the fact that Hunt Petroleum Corp. v. State, 901 So.2d 1 (Ala.2004), is controlling as to the State's failure to establish any reasonable reliance upon what it alleged were misrepresentations by Exxon.
SEE, Justice (concurring in part and concurring in the result).
A Montgomery County jury found that Exxon Mobil Corporation ("Exxon") had committed fraud and was in breach of certain gas leases it had entered into with the State. The jury awarded the State both compensatory and punitive damages. The main opinion holds that the trial court erred in denying Exxon's motion for a judgment as a matter of law on the fraud claim and reverses the award of punitive damages associated with that claim. The main opinion also holds that the trial court erred in denying Exxon's motions for a judgment as a matter of law on the breach-of-contract claims involving Exxon's failure to pay royalties on its manufacture of sulfur products and slop oil and on the allegedly "lost gas," but it affirms the judgment below on the other breach-of-contract claims. I concur only in the result as to the breach-of-contract claims related to certain of the lease provisions that I conclude are ambiguous, and I also write specially to address certain of the State's arguments regarding the fraud claim that are not addressed by the main opinion. Otherwise, I concur in the main opinion.

I. Beach-of-Contract Claims

A. Unpaid Volumes  Fuel Gas
Exxon argues that it is entitled to a judgment as a matter of law on the State's *1119 "fuel-gas" claim because traditionally oil and gas leases allow the lessee free use of gas to develop and operate the leased area. Exxon therefore contends that it rightfully did not pay a royalty on gas used for the operation of its offshore production platforms located on the leased areas or for the operation of its onshore treatment facility. The State argues to the contrary that the leases do not allow the free use of gas except for two purposes  flaring and lift purposes.
The main opinion upholds the judgment in favor of the State on the fuel-gas claim, concluding that "[t]he lease language is clear on the matter of the fuel-gas claim." 986 So.2d at 1106. I agree with that holding, but I disagree that the terms of the leases on the matter of fuel gas are clear, that is, unambiguous, and with the consequent implication that Exxon's interpretation is not reasonable.
Paragraph 5(b) of the leases provides:
"If gas, of whatever nature or kind ... is used, on or off the leased area, by [Exxon] for purposes ... other than solely in the development and operation of the leased area as provided herein, [Exxon] shall pay [X]% of the net value realized by [Exxon] or affiliate from the sale or disposition of the manufactured or extracted products and [X]% of the best price realizable in the exercise of reasonable diligence for all gas used and not sold."
According to Exxon, this language "on its face" grants it royalty-free use of gas in operating the offshore production platforms because, it argues, it is using the gas in the "operation of the leased area." Exxon argues further that under standard gas-accounting guidelines the exemption extends to the gas fuel used off the leased areas at the onshore treatment facility. Such an interpretation does not appear unreasonable. The language that requires the payment of a royalty when gas is used "for purposes ... other than solely in the development and operation of the leased area as provided herein" does suggest that the leases permit the royalty-free use of gas in the development and operation of the leased area.
However, I believe that the lease provision also can reasonably be read as the State reads it  to require Exxon to pay a royalty on gas produced from any well that is drilled, except in two limited circumstances: (1) when gas is flared for well-testing (paragraph 5(a)), and (2) when gas is recycled for lift purposes (paragraph 5(d)).[21] The requirement of paragraph 5(b), that a royalty must be paid on all gas used on or off the leased areas except for gas used "solely in the development and operation of the leased area as provided herein," may reasonably be read to refer only to those two exceptions.
As the State correctly notes, the leases contain a provision, in paragraph 27, which requires that, "[i]n the case of ambiguity, this lease always shall be construed in *1120 favor of [the State] and against [Exxon]." "A term in a contract is ambiguous only if, when given the context, the term can reasonably be open to different interpretations by people of ordinary intelligence." Lambert v. Coregis Ins. Co., 950 So.2d 1156, 1162 (Ala.2006). Thus, if the leases reasonably can be read in the State's favor, we must adopt that understanding. Because I believe that we may reasonably construe the leases in the State's favor, I agree that the trial court did not err in denying Exxon's motion for a judgment as a matter of law as to the fuel-gas claim.

B. Payout and Unitization

1. Improper Rates
Exxon argues that it is entitled to a judgment as a matter of law on the State's "payout" claim. Under the "payout" provisions of certain of the leases, Exxon enjoys the benefit of a lower royalty rate while it recoups its direct costs of "actually drilling wells on the leased area." According to the State, Exxon has been allocating "drilling" costs to leases where no actual wells exist, thus paying the lower royalty rate on those leases. Exxon argues that the leases allow it to "allocate a proportionate share of recoverable expenses to unitized payout leases that share in production from wells on other leases in the area." Exxon's brief at 94.
Paragraph 5(a) of the leases provides that Exxon will pay a lower royalty until it reaches "payout," at which time Exxon will pay a higher royalty. Paragraph 29(1) defines payout as
"`the point in time when [Exxon] has recovered from production, after deduction of state royalty, severance and production taxes, the direct expenses incurred in actually drilling wells on the leased area beginning, for each well, with the spud date and ending on the date each well is ready to be put into production.' The cost of pipelines and treating facilities are expressly excluded as recoverable expense items."
Paragraph 28 defines "actual drilling operations" to mean
"actual drilling (commenced by spudding in) of a new well, or the good faith deepening, sidetracking, or the plugging back or attempted recompletion in a separate interval of an existing well (all such operations being commenced by actual downhole operations with adequate tools).... Actual drilling operations shall be deemed to terminate on the last day actual operations of any kind (such as drilling, testing, or installation of equipment) are conducted in good faith for the purpose of attempting to discover oil, gas or any other liquid or gaseous hydrocarbon mineral as a producer of same."
According to the State, this language requires actual drilling on a well site within the leased areas in order for Exxon to take advantage of the payout provision.
Paragraph 17 provides, however, that when
"acreage covered by this lease or any parts thereof is pooled or unitized by government order with other land, lease or leases in the immediate vicinity thereof... operations for drilling, reworking or production on the land so pooled covered by this lease and the entire acreage constituting such unit or units shall be treated for all purposes as if the same were included in this lease . . . ."
Exxon argues that because operations for drilling on one of the units is treated as if that unit were included in the leased area, then actually drilling on one of them should be considered "actual drilling" for purposes of payout.
The main opinion concludes that "[t]he meaning of the payout clause in the leases *1121 is clear...." 986 So.2d at 1108. I disagree with that conclusion, though I agree with the holding in favor of the State. Paragraphs 29(1) and 17 are not readily reconcilable. I believe that Exxon's interpretation is a reasonable, perhaps even a preferable, one; nonetheless, I believe that the State's interpretation  that actually drilling on the leased area, and not on some area outside it, is required for the lower royalty rate to apply to the gas coming from that area  is also a reasonable interpretation.
Paragraph 28 and paragraph 29(1), when read together, suggest that the leases require that some activity related to drilling be actually present in order for the payout provision to apply. Thus, "actually drilling wells on the leased area" may mean that, on that leased area, drilling, as defined in paragraph 28, must be taking place. Because paragraph 27 requires this Court to construe the leases in favor of the State where the leases are ambiguous, and because the State's interpretation is a reasonable one, I agree that the trial court did not err in denying Exxon's motion for a judgment as a matter of law on this ground.

2. Capital Expenses
Exxon argues that it was entitled to include the costs of its corrosion-resistant flowlines and the costs of the offshore production platforms as drilling expenses that must be recouped before it becomes subject to the higher royalty rate. The leases specifically exclude the costs of the gathering system and the onshore treatment facility, but they are silent as to the flowlines and the offshore production platforms. Despite this silence, the main opinion concludes that the leases are clear as to what expenses may be recovered under the payout provision. I disagree that the terms of the leases are unambiguous; the leases expressly excluded the gathering system and onshore treatment facility, but they do not expressly exclude the costs of the flowlines and the offshore production platforms. Exxon argues that the definition of drilling, found in Gulf Oil Corp. v. Reid, 161 Tex. 51, 55, 337 S.W.2d 267, 270 (1960), which this Court applied in Sheffield v. Exxon Corp., 424 So.2d 1297, 1302 (Ala. 1982), as "all physical and mechanical activities of securing oil and/or gas production in paying quantities" includes the costs of flowlines and of the oil platforms. That interpretation of the payout provision is, I believe, a reasonable one.[22]
Nonetheless, the definition of "actual drilling operations" that provides that such operations will "be deemed to terminate on the last day actual operations of any kind... are conducted in good faith for the purpose of attempting to discover oil, gas or any other liquid or gaseous hydrocarbon mineral" suggests that only those costs necessary to drill the well  rather than those costs necessary to produce gas  may be properly included as the costs of drilling wells. Because paragraph 27 requires this Court to construe the leases in favor of the State in the case of ambiguity and because the State's interpretation is a reasonable one, I agree that the trial court did not err in denying Exxon's motion for a judgment as a matter of law on this ground.

C. Cost-Netting
Exxon argues that, under the leases, natural gas is properly valued at the offshore *1122 production platform and that post-production costs of gathering and treating the gas are therefore properly deductible from the base amount on which Exxon was to pay the royalty as a percentage of its gross proceeds. Paragraph 5 provides:
"When production of oil, gas or any other liquid or gaseous hydrocarbon mineral from the leased area is obtained, [Exxon] agrees to pay [the State] ... the following royalties:
"(a) The value of [X]% of the gross proceeds from oil, distillate, condensate, gas, natural gasoline or other product covered by the lease, produced and sold from the leased area at the price received therefor or at the best price realizable in the exercise of reasonable diligence, whichever is higher...."
The State argues that Exxon was prohibited from deducting the gathering, processing, treatment, and other costs from gas-sales proceeds in calculating the royalties owed. The main opinion concludes that the royalty provisions are clear, holding that "`gross proceeds' means `gross proceeds.'" 986 So.2d at 1109.
I believe it is reasonable to read the leases, in light of principles of oil and gas law, as establishing a valuation point and, therefore, as allowing Exxon to deduct certain costs so that the value of the gas at that particular point in the production process may be calculated. However, the State also presents a reasonable construction of the leases. The State argues that the leases do not establish a valuation point and that the "gross proceeds" language prohibits Exxon from adjusting its gross proceeds to deduct its costs in gathering and treating the oil. The leases use the term "gross proceeds" for calculating the royalty on gas produced and sold from the leased area, in contrast to the treatment in the leases of the calculation of royalties on manufactured products, where the term "net amount realized" is used. The contrast between the language used in these different contexts suggests that the leases do not allow cost-netting with regard to the calculation of the royalty for gas produced and sold.
Although it is reasonable to interpret the "produced and sold from the leased area" language as creating a valuation point, the State's interpretation is not unreasonable. The language of the leases does not unambiguously create a valuation point, and Exxon ultimately asks this Court to imply that one exists from the terms of the royalty provisions. Paragraph 27 requires us to construe any ambiguities in the leases in favor of the State. Because we may reasonably construe the leases in the State's favor, we must adopt that construction. For this reason, I agree that the trial court did not err in denying Exxon's motion for a judgment as a matter of law on the cost-netting issue.

D. Cogenerated Electricity
Exxon argues that it was entitled to a judgment as a matter of law on the State's breach-of-contract claim alleging that Exxon owes a royalty on the net proceeds of electricity produced from generators powered by fuel gas. I have already noted above that Exxon owes a royalty on fuel gas used to operate the offshore production platforms and to operate the onshore treatment facility; here I address the royalty owed on fuel gas that was used to produce surplus electricity that Exxon then sold to Alabama Power Company.
Under paragraph 5(b), Exxon owes a royalty "[i]f gas ... is used by [Exxon] for... the manufacture or extraction therefrom of gasoline or other products not covered by the royalty provisions of subparagraph (a)...." Exxon argues that this language requires it to pay royalties only on products manufactured from gas, *1123 not products manufactured using gas. Further, it contends that only constituent products of gas are subject to royalties. The State points out that paragraph 5(b) requires that a royalty be paid on "products," not only on "hydrocarbon products." It notes that even though the need to pay a royalty is triggered only when "oil, gas or any liquid hydrocarbon material" is obtained, that fact does not eliminate the requirement that a royalty be paid whenever these materials are used to manufacture "other products." The main opinion concludes that electricity is a manufactured product as a matter of law and relies on Curry v. Alabama Power Co., 243 Ala. 53, 8 So.2d 521 (1942), to reach its conclusion. I do not believe it is necessary to resort to our caselaw to answer this question. Paragraph 5(b) reasonably can be read to require a royalty payment on gas used to manufacture electricity. The word "from" indicates the source of something. Webster's Third New International Dictionary 913 (1971). The source of the electricity is the gas that is being burned in the generator and that moves the turbines. The electricity can reasonably be said to be coming from the gas, because gas is the source of the energy that is transformed into electricity.
I recognize that this Court's cases have stated that, in various circumstances, electricity is a manufactured product; however, I do not believe that those cases conclusively decide the question in all circumstances and for all purposes. The question before us, however, is not whether our cases define electricity as a manufactured product; the question is whether the leases may be reasonably interpreted to define electricity as a manufactured product. Nonetheless, I recognize that the fact that this Court has in the past defined electricity as a manufactured product buttresses the conclusion that so defining it in this case is not unreasonable.
Paragraph 27 requires this Court to construe any ambiguities in the leases in favor of the State, and we must adopt the State's construction of the leases if it is reasonable. Because we may reasonably construe the leases in the State's favor, I agree that the trial court did not err in denying Exxon's motion for a judgment as a matter of law on this ground.

II. Fraud
I agree with the main opinion that there is a lack of substantial evidence supporting the State's fraud claim and the associated punitive-damages award. Although I generally agree with the analysis in the main opinion, I believe that the State raises several key arguments that need to be addressed. These include the State's argument that Exxon's wire transfers before December 1994 constituted misrepresentations and its various suggestions of ways in which the State relied on these alleged misrepresentations.

A. Misrepresentations
The State argues that Exxon misrepresented the fact that it was not calculating its royalty obligation in accordance with the State's interpretation of the leases. However, as early as 1990, Exxon provided the State with copies of payout statements that disclosed Exxon's interpretation of the payout provisions of the 1984 leases. In those statements, Exxon allocated payout expenses to unitized leases with no physical wells and included flowline and platform costs in payout expenses. Further, in February 1995, Nancy Cone, a revenue analyst with the State Lands Division of the State Department of Conservation and Natural Resources ("DCNR"), met with Linda Kraft and LeaAnn Jones of Exxon, who informed Cone that Exxon *1124 was taking certain deductions, was paying royalties only on cogenerated plant fuel, and was not paying a royalty on sales of sulfur. Cone informed James Griggs, director of the State Lands Division, of these facts in a March 1995 memorandum, in which she also noted that Exxon was not paying a royalty on sales of slop oil. Thus, by March 1995, at the latest, Exxon had explained to DCNR the method by which it calculated the royalties it was paying.
Further, as early as December 1994, Exxon submitted monthly production reports that showed that Exxon was taking deductions rather than paying the "gross proceeds" on the sales of gas. These reports itemized both "gross" and "net gross" proceeds. The State argues that "[b]ecause both Exxon and the State knew that post-tailgate transportation costs were deductible, it was natural for the State to assume that `net gross' simply referred to the gross amount offset by this discrete category of permissible transportation costs." State's brief at 84 n. 50. However, the royalty reports do not support this contention because the differences between the gross and net gross values were too great to be accounted for by transportation costs alone. Although DCNR apparently did not scrutinize these reports before initiating its audits,[23] there is no contention by the State that these figures misrepresent the volumes on which Exxon based its royalty obligations. Thus, the State has not presented evidence of any misrepresentation after December 1994 sufficient to support its fraud claim.
The State also argues that "Exxon's initial royalty payments carried with them the representation, consistent with what Exxon knew to be the State's expectation and belief, that the payments amounted to the specified percentage of Exxon's `gross proceeds' from gas sales and the value of gas as fuel." State's brief at 84. However, at most, the State's evidence shows (1) that Exxon understood that DCNR officials were not interpreting the leases in a way that allowed cost-netting, and (2) that the State may have assumed that Exxon would calculate its royalty obligation according to DCNR's interpretation. The evidence does not show that Exxon ever represented to DCNR that it agreed with DCNR's interpretation of the leases, nor does it show that Exxon represented that its wire transfers were made in accordance with DCNR's interpretation.
The State points to the "Condray documents," a briefing package prepared for Exxon management regarding possible interpretations of the leases, and suggests that those documents are proof that the wire transfers constituted misrepresentations. In its brief, Exxon admits that its management "approved a narrow cost-netting approach it believed consistent with staff's recommendation that it be `fairly aggressive (given our lease terms) and pursue all cost-netting items with a 25% or greater chance of success.'" Exxon's brief at 22. Although the State argues that this decision proves that Exxon intentionally misrepresented the royalties Exxon owed, it shows at most that Exxon adopted an interpretation of the leases that it believed could be supported by the terms of the leases. Ansel Condray, a senior vice president at Exxon, testified that he chose not to adopt all the recommendations in the Condray documents, but instead rejected those that Exxon management "did not *1125 think the best reading that we could give to it entitled us to take those deductions."
The State argues that paragraph 27 of the leases required that any ambiguities be interpreted by the Court in the State's favor; however, that paragraph does not necessarily make whatever interpretation the State might choose to adopt definitive and binding. For these reasons, I do not believe that the State has produced substantial evidence of any misrepresentations by Exxon.[24]

B. Reasonable Reliance
Even if this Court were to assume that Exxon had misrepresented the amount of royalties it owed by means of its wire transfers before December 1994, I believe that the State has failed to put forward substantial evidence showing that it reasonably relied on any of those alleged misrepresentations. As this Court has noted, "[a]n essential element of any fraud claim is `reasonable reliance.'" Mantiply v. Mantiply, 951 So.2d 638, 658 (Ala.2006). Exxon argues that our decision in Hunt Petroleum Corp. v. State, 901 So.2d 1 (Ala. 2004), is controlling. I agree. In Hunt Petroleum, this Court reversed an award of punitive damages to the State based on what was alleged to have been a scheme to defraud the State of royalties under the same standard lease form that is at issue in this case. We held that the State had failed to prove fraud because it had never relied on Hunt Petroleum's reports showing the volume of gas produced. Although DCNR officials testified that they had "assumed" that the reports were correct, DCNR accepted them subject to verification through audits it had always intended to conduct.
This Court noted that, "for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." Hunt Petroleum, 901 So.2d at 5. DCNR always had intended to verify by audit the reports that Hunt Petroleum submitted; it did not accept and rely upon the accuracy of those reports. Further, because the State produced insufficient evidence showing how it would have acted differently had the reports correctly explained the royalty owed, "the State did *1126 not meet its burden of proving by substantial evidence that it relied to its detriment on the monthly royalty reports submitted by Hunt." Hunt Petroleum, 901 So.2d at 9.
The State argues here that "the record [in this case] contains overwhelming evidence of reliance." State's brief at 96. The evidence in the record shows the contrary, i.e., that the State did not rely on any of the wire transfers as representations that Exxon was calculating its royalty obligations in accordance with the State's interpretations of the leases. Cone testified on cross-examination as follows:
"Q. When that money gets wire-transferred in and put in the State's treasury account, that doesn't mean that it is accepted as true and accurate, does it?
"A. No, sir.
"Q. Because it is in your view even at the time just conditional and subject to audit; is that not a fair statement?
"A. Yes, sir."
A memorandum from Cone to Director Griggs explained that "[t]he acceptance by DCNR of the monthly royalties does not indicate DCNR accepts the deductions Exxon is taking against the gross value of the production. The deductions will be reviewed when DCNR audits Exxon's operation." As Cone's testimony indicates, the State did not accept the wire transfers as "true and accurate."
The record demonstrates, as did the record in Hunt Petroleum, that DCNR always intended to audit Exxon's monthly reports in order to independently verify them. A memorandum from Griggs to James Martin, then commissioner of DCNR, stated that "[t]he lands division does not capture [that is, record,] the production or sales volumes associated with the royalty payments. We rely on the audits of the companies by the accounting section to verify this information as a routine part of their audit program." Griggs also testified that "our plan had been to audit every time period, and it still is to audit every time period." Thus, the State did not rely on any of Exxon's representations because it always intended to independently verify them.
The State presents several arguments in support of its position that it reasonably relied on the alleged misrepresentations. It argues that it had to rely on Exxon's royalty payments and reports in order to perform its audits of Exxon and cites testimony that its auditors relied on the truthfulness of the royalty calculations and the production volumes. However, this testimony provides only conclusory statements and does not indicate how the auditors used the information Exxon provided.
Further, as Exxon argues,
"[t]he entire purpose of the State's audits was to go behind Exxon's payments and royalty reports to determine whether Exxon owed more. To that end, the auditors used Exxon's royalty reports only to determine the dollar amount of royalties Exxon had already paid (which no one claims the reports misstated)."
Exxon's reply brief at 9. Additionally, DCNR used the production reports filed with the Alabama Oil and Gas Board, as well as Exxon's own production statements, to independently recalculate the royalties owed. The State does not contend that Exxon falsified the underlying production and sales records reflecting what Exxon actually produced and sold, nor does it contend that the wire transfers misrepresented what amounts Exxon actually paid. It is these figures that served as the basis for the audit.
The State argues further that it necessarily relied on Exxon's reports because "its auditing ability was limited." State's brief at 99. The State cites Griggs's testimony that DCNR's auditors would not be *1127 able to "look at every piece of paper for every day" and that it was unclear whether the State, because of budgetary constraints, would be able to audit for every period. State's brief at 100. However, DCNR's limited auditing ability was caused by factors wholly separate from Exxon's alleged misrepresentations, and, in any event, DCNR was unwilling to accept Exxon's royalty payments without verification of the figures.
The State suggests a number of other ways in which it would have acted differently had it not relied on Exxon's alleged misrepresentations. Several of these arguments have been previously rejected by this Court in Hunt Petroleum. There, we rejected the State's argument that "the reliance requirement in a fraud action can be met where a party accepts underpayments from another who has complete control over the payment process," concluding that such a holding would amount to adopting a "no-reliance fraud standard." Hunt Petroleum, 901 So.2d at 9 n. 8. We also rejected the argument that the State was misled into surrendering its gas because, as here, the State always intended to audit the reports and accepted royalty payments subject to that verification. Further, in Hunt Petroleum, as in this case, the State did not demonstrate how it would have acted differently had it known of the alleged misrepresentations. The State never attempted to cancel the leases and never exercised its right to take gas in kind.
The State argues that it would have sued Exxon earlier had it known of the alleged misrepresentations. However, this Court held in Hunt Petroleum that "compelling [a party] to bring [a] legal action" cannot amount to reliance by that party. 901 So.2d at 8 n. 7. The State would distinguish this language by framing its argument to suggest it has been deprived of its right to sue sooner; however, the State cites no authority for the proposition that this represents reliance.
Finally, the State argues that the alleged misrepresentations caused the State to delay the audits and resulted in more expensive and time-consuming audits. The State's witnesses testified that had they known of Exxon's interpretation of the leases, they would have recommended bringing the audits immediately. However, the evidence at trial showed that it was the State's actions that delayed the audits. Before Exxon made any wire transfers and before it submitted any reports, DCNR already had decided that it would verify by audit the information that Exxon provided.
During an audit of Shell Oil Company in 1993, DCNR had recognized that its in-house auditors were not sufficiently qualified to perform the audits on the gas leases. Defense Exhibit 157 (Memorandum from Martin to G. Sage Lyons, State Finance Director). Audits on the gas leases were delayed while DCNR decided who the outside auditor should be. Once DCNR decided on an outside firm, the audits began, as DCNR apparently always had intended.[25] The State, thus, had decided in April 1993 to suspend its audit program, months before Exxon began the production of gas in October 1993 and months before Exxon had made any wire *1128 transfers, while DCNR attempted to retain a natural gas audit expert. Therefore, it was not the State's reliance on the alleged payment misrepresentations that caused it to delay or to perform a more expensive or more extensive audit.
Even after Exxon informed DCNR that it was calculating its royalty obligation based on an interpretation of the leases at variance with DCNR's interpretation, the State nevertheless did nothing different. A memorandum from Cone to Griggs in March 1994 shows that DCNR was aware that Exxon was taking deductions, paying royalties only on cogenerated plant fuel, and not paying royalties on sales of sulfur and slop oil. Nonetheless, DCNR did not initiate an audit until August 1996, and no one appears to have made use of any of the data Exxon provided before of the audits began. The State did not bring its fraud claim until August 1999. The State never attempted to cancel the leases and never exercised its right to take gas in kind. That the State did nothing different after Exxon explained in February 1995 that it did not agree with the State's interpretation of the leases strongly suggests that the State would have acted no differently had it had that information before February 1995.[26]
A court reviewing a ruling on a motion for a judgment as a matter of law must determine whether the party that bears the burden of proof has produced substantial evidence creating a factual dispute that requires resolution by the jury. Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003). The State bore the burden of proof on its fraud claim, and I agree with the main opinion that there is not substantial evidence showing that Exxon made any misrepresentations or that the State reasonably relied on any of Exxon's alleged misrepresentations. I also agree that the punitive-damages award therefore must be reversed. See Wholesale Motors Inc. v. Williams, 814 So.2d 227, 230 (Ala.2001) (requiring "clear and convincing" evidence and a finding of fraud before allowing an award of punitive damages); John Deere Indus. Equip. Co. v. Keller, 431 So.2d 1155, 1157 (Ala.1983) ("Punitive damages are generally not allowed in actions for breach of contract.").

III. Conclusion
For the foregoing reasons, I concur in the result as to the contract issues I raise above; otherwise, I concur in the main opinion.
LYONS, Justice (concurring in part and concurring in the result).
I concur in all aspects of the main opinion except for Part III.B., as to which I concur in the result.
Under very few legal systems could one envision a scenario where a cash-strapped government could hire lawyers to sue a party to a contract with that government, then pay the salary of the trial judge and the per diem of a panel of jurors composed of citizens of that government, and thereafter obtain an enormous judgment in its favor for punitive damages, and, on appeal, a panel of appellate judges, whose salaries are also paid by that government, would set that judgment aside.[27] Yet, that is *1129 exactly what happened in this proceeding. That this could come to pass is a testimonial to the genius of the American system of government only if the result stands on a principled basis.
Because many citizens, aware of the State's financial needs and familiar with snippets of the evidence in this case gleaned from news coverage, simply will not understand how this Court could reach such a result after two separate Alabama juries found Exxon deserving of an enormous punishment in the form of billions of dollars in punitive damages, I set forth, step by step, the process of legal reasoning through which I concluded that reversal of the judgment as to the fraud claim was required under the settled law of this State. In doing so, I have made a conscious effort to express my views in terms that can be understood by persons not learned in the law.
A dispute between parties to a contract gives rise to diverse and sometimes overlapping remedies. The availability of different remedies depends on the timing and nature of the acts giving rise to the dispute. These factors become significant because the remedy historically available for an action for breach of contract is limited to compensatory damages only. Tort-based remedies can permit the recovery of both compensatory damages and punitive damages. This case requires us to consider the elements necessary to permit a dispute between parties to a contract to have a remedy in tort. If Alabama law fails to recognize a remedy in tort under the circumstances here presented, then the trial court never should have allowed the claims of the Alabama Department of Conservation and Natural Resources ("DCNR") against Exxon grounded in tort to go to a jury, and the verdict awarding punitive damages based on fraud must be set aside.
Two separate juries of conscientious Alabama citizens have found Exxon's conduct so infuriating as to lead them to award enormous sums in punitive damages. Although these verdicts may reflect extremely adversely on Exxon's business ethics, their entry does not alter this Court's obligation to set the current verdict aside if Exxon's conduct does not, as a matter of Alabama law, constitute a tort.
We analyze the circumstances governing the availability of a remedy in tort between parties to a contract by first noting the long-standing rule applicable to fraudulent conduct during negotiations, an interval that concludes when the parties strike their bargain and enter into a contract. A party who has been the victim of a misrepresentation of a material fact or the suppression of a material fact when there is a duty to speak upon which it reasonably relied during negotiations can claim fraud in the inducement. See, e.g., Lacey v. Edmunds Motor Co., 269 Ala. 398, 402, 113 So.2d 507, 510 (1959) ("It is a well-established principle in Alabama that a buyer alleging that he was induced by fraud to enter into a contract may rescind by restoring benefits and recover payments, or affirm, retain benefits, and sue in deceit for damages...."). In such cases, the aggrieved party, in effect, says, "I would never have entered into the contract if you had not induced me to do so by incorrect statements or omissions of material facts." Regardless of whether the remedy is rescission or deceit, a plaintiff can recover punitive damages when the conduct was reckless or intentional. See Old Southern Life Ins. Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976) (action in deceit for damages); and Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975) (action for rescission). We lay these alternative remedies aside because DCNR does not assert fraud in the inducement.
*1130 After becoming bound to the terms of a contract, subsequent events can, but as a general rule do not, give rise to a remedy in tort. Failed expectations as to performance of a contract usually result only in a remedy for breach of contract. See C & C Prods., Inc. v. Premier Indus. Corp., 290 Ala. 179, 186, 275 So.2d 124, 130 (1974) ("A mere failure to perform a contract obligation is not a tort, and it furnishes no foundation for an action on the case."). Thus, a party experiencing a failure to perform a contract in the typical situation cannot characterize the other party's promise to perform as a misrepresentation and thereby convert the action to one based upon the tort of fraud. However, if a promise to perform in the future is made with no intention to perform at the time the promise was made, it is promissory fraud and will give rise to an action in tort for which compensatory and punitive damages may be recovered. Kennedy Elec. Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983). Such a claim is difficult to prove, because mere failure to perform is not evidence of a lack of intent to perform at the time the contract was formed. Campbell v. Naman's Catering, Inc., 842 So.2d 654 (Ala.2002) (summary judgment in favor of employer). We lay this remedy aside because DCNR does not assert promissory fraud.
Another exception to the general rule against turning a breach-of-contract action into a tort allows an insured suffering a breach of an insurance contract to assert a remedy in tort when the insurer's basis for its conduct is so lacking in substance as to warrant the conclusion that it acted in bad faith when it failed to perform. State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293 (Ala.1999). In such circumstance a recovery of both compensatory and punitive damages is appropriate. Because Exxon is not an insurance company and because DCNR has specifically disavowed any interest in seeking the expansion of the remedy of bad faith beyond the confines of insurance contracts, we need not further consider this circumstance.[28]
This Court has recognized the availability of a tort remedy between parties to a contract not involving insurance in instances where, after entering into the contract, the injured party can show fraud by the other party. DCNR contends that the verdict awarding punitive damages should be sustained under this theory. We must therefore examine closely our caselaw in this area in light of the facts of this case.
The leading case is Deupree v. Butner, 522 So.2d 242 (Ala.1988), in which a developer represented to prospective purchasers of a townhome that it would give the purchasers of the townhome access to the purchasers' own boat slip. At the time of the negotiations and up until the closing, the developer experienced serious ongoing problems with regulatory authorities that cast substantial doubt on its ability to perform. Over two months after the closing and at a time when the ongoing problems had not been resolved, the developer wrote a letter reiterating its ability to construct the boat slip, stating that it was merely a matter of time before it did so. The developer ultimately failed to perform, and the purchasers sued, alleging fraudulent concealment in the inducement of the contract and fraudulent concealment during the performance of the agreement, as evidenced by the letter written after the closing. *1131 This Court, affirming a judgment entered on a jury verdict in favor of the purchasers, recognized the availability of a cause of action based on fraudulent concealment relating to the events both before and after the closing. With respect to events after the closing, this Court stated:
"The [purchasers'] fraud claim was based on [the developer's] concealment of the difficulties he was having with getting approval of the boat slips. [The developer] wrote a letter to [one of the purchasers] on July 26, 1983 [over two months after the closing], and stated that it was simply `a matter of time' until the permits would be issued."
522 So.2d at 246.
It is hornbook law that fraud is composed of multiple elements, namely, a false statement of a material fact or concealment of such a fact under circumstances where there is a duty to speak and reasonable reliance to the detriment of the victim. See, e.g., Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988). In Hunt Petroleum Corp. v. State, 901 So.2d 1 (Ala.2004), a case in which I recused myself, this Court did not dwell on the availability of a remedy for fraud in the performance of a contract very similar to the contract here presented; instead, it moved directly to an examination of the evidence of reliance and found it wanting. Such approach, of necessity, assumed, without deciding, the availability of fraud in the performance of the contract under the facts presented in that case. Only Justice Houston, in his special concurrence, 901 So.2d at 9, probed the availability of a remedy for fraud. In so doing, he attempted to limit the holding in Deupree to pre-closing suppression, beyond, I respectfully submit, the previously quoted holding of the Court clearly recognizing post-closing conduct as part of the basis for the fraud claim. In Bethel v. Thorn, 757 So.2d 1154 (Ala.1999), this Court had previously embraced a broader view of Deupree than that of Justice Houston in his special writing in Hunt Petroleum. We observed, citing Deupree: "This Court has recognized that fraudulent concealment of facts after a contract has been made can support both a breach-of-contract claim and a fraud claim." 757 So.2d at 1162 (emphasis added).
Applying Deupree to this case, we must first set forth some details of the timeline of performance here. Although Exxon executed leases in 1981 and 1984, Exxon did not begin production until December 1993, when it began making monthly payments pursuant to the leases. Exxon provided no backup information to DCNR until December 1994, at which time Exxon furnished backup information for September, October, and November 1994.
DCNR accuses Exxon of both misrepresentations and suppression, relying upon internal documents of Exxon that reasonable jurors could find to be indicative of an arrogant, callous, condescending attitude toward DCNR, grossly inconsistent with the terms of the leases and involving contumacious bad faith. As previously noted, however, we have not been asked to expand the remedy of tortious bad-faith breach of contract beyond the context of an insurance policy. Further, in order to prove fraud that would justify an award of punitive damages, DCNR must prove by "clear and convincing evidence that [Exxon] consciously or deliberately engaged in... fraud...." § 6-11-20(a), Ala.Code 1975.
Turning first to the alleged misrepresentations by Exxon, DCNR has presented absolutely no evidence of any misstatement of any facts by Exxon. Exxon never inflated the costs it claimed the right to deduct, nor did it misrepresent the volume *1132 of gas it was extracting.[29] When DCNR insisted that Exxon furnish it with the backup information required under the leases, Exxon did so with truthful disclosure of its methodology of computing the amount due. The reports that began in December 1994 reflected that deductions were being taken from cogenerated gas and the residue of gas, with no deductions being taken from flare gas.
Flare gas is immediately burned at the well, thus incurring no costs in treatment at an onshore facility miles from the wellhead. DCNR contends that the lack of necessity for any deductions from flare gas constitutes a subtlety so far over the heads of personnel at DCNR, who drafted this complex lease agreement, that Exxon's report continued to mislead DCNR as to whether Exxon was taking any deductions. Such a contention is an assault upon the expertise of DCNR that is perhaps as offensive as any of the portions of Exxon's documents relied upon by DCNR in support of its fraud claim as proof of Exxon's contempt for the expertise of the personnel at DCNR. DCNR's contention as to its own lack of sophistication in interpreting the significance of the absence of deductions taken from gas burned immediately at the well does not constitute clear and convincing evidence of fraud by Exxon in its reports to DCNR.
DCNR also contends that knowledge of the fact of deductions appearing on the monthly reports is not in itself sufficient because, for aught appearing, these deductions might merely reflect transportation charges that Exxon could legitimately deduct. The size of the deductions were of sufficient magnitude that no reasonable person in an agency capable of drafting this complicated lease agreement could attribute the extent of Exxon's deductions to this one item. But even if the monthly reports were inadequate to put DCNR on notice as to the extent of Exxon's deductions, at a February 27, 1995, meeting with Exxon, Nancy Cone of DCNR was made fully aware of Exxon's interpretation of the leases. Thereafter, DCNR continued *1133 to accept payments from Exxon without comment and did not began its audit until more than a year later. DCNR has failed to establish any misrepresentation of a material fact and therefore has failed to present clear and convincing evidence of any false statement.
Turning next to suppression of material facts, we must focus on the interlude between the commencement of production in December 1993 and Exxon's submission of the first reports in December 1994 and events in early 1995. DCNR contends that the agreement required Exxon to furnish information to it beginning in December 1993. Exxon contends that it furnished adequate information to the Alabama Oil and Gas Board and that, in all events, paragraph 6 of the lease agreement gave DCNR a right of access to all relevant information, and, therefore, there could have been no concealment. Accepting DCNR's contention that it, and not the Alabama Oil and Gas Board, was entitled to receive the information and, further, ignoring DCNR's contractual right of access to this information, which it failed to exercise, the period of silence of approximately one year could be viewed as a period during which Exxon suppressed material facts concerning its interpretation of the contract. But, as previously noted, DCNR must prove not only the omission of material facts under circumstances giving rise to a duty to disclose, but also reasonable reliance upon such omission to its detriment. In order to find reasonable reliance, causing damage, resulting from the concealment for approximately one year, we must assume that DCNR, had it known the suppressed facts, would have conducted itself in a manner different from the manner in which it acted during its period of ignorance, thereby enabling it to recoup damages sustained during the limited period when it lacked knowledge of the facts. However, when Exxon's position was explained to DCNR in late 1994 or early 1995, DCNR did absolutely nothing for a period in excess of the duration of DCNR's lack of knowledge between December 1993 and late 1994 or early 1995. Indeed, James D. Martin, commissioner of DCNR, acknowledged that delay in auditing was not the fault of any oil company.
Because of this inactivity during the period after DCNR had full disclosure, attribution of reliance damages in the form of the State's monetary loss between December 1993, when production began, and December 1994, when disclosure took place, is simply too speculative to support a conclusion that DCNR reasonably relied to its detriment for the period during which DCNR was ignorant of Exxon's interpretation of the leases. Nor would a liberal rule of proof of causation favorable to the plaintiff in instances of an intentional fraud, as recognized in Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So.2d 601, 607 (Ala.1980), make a difference in this proceeding where there is simply no basis for which to conclude that DCNR would have acted differently had it received earlier disclosure.
Returning to Deupree, the purchasers there alleged both fraudulent inducement to enter into the contract and fraudulent suppression before and after consummation of the contract. As to the fraudulent-inducement claim, the purchasers could point to the existence of a contract that they said they would never have entered into but for the suppression. On appeal, the developer attacked the sufficiency of the evidence of fraud, and this Court found, among other things, detrimental reliance, both before and after entering into the contract, as well as a duty to speak. Here, unlike Deupree, DCNR has failed to establish damage from suppression of material *1134 facts by Exxon after entering into the contract and during the approximately one-year period commencing in late 1993 when gas was first produced.
Given DCNR's disavowal of any right to relief for fraud in the inducement, its disavowal of any right to relief for promissory fraud, its disavowal of any interest in expanding the remedy of bad-faith breach of contract beyond insurance contracts, its failure of proof of misrepresentation of any material facts, and its failure of proof of reliance to its detriment on any suppressed material facts during the limited period of nondisclosure, I must conclude that DCNR has not established a legally cognizable evidentiary basis for a remedy in tort. Therefore, I concur in the result as to the reversal of the judgment entered on the award of punitive damages.
We are thus left with a situation in which one of the parties to a contract has taken a hard-nosed bargaining position, cynically relying on a downside that it accurately deemed to be limited to compensatory damages plus interest, without any risk of exposure to punitive damages. Although a jury could reasonably conclude from the evidence that Exxon's business ethics would pass only the first prong of the Rotary Club's famous "4-Way Test,"[30] that circumstance does not give rise to a basis under settled Alabama law for an award of punitive damages.
COBB, Chief Justice (concurring in part and dissenting in part).
I am in substantial agreement with the analysis of the breach-of-contract claims in the main opinion, and I concur with the Court's opinion in that respect. However, I dissent from the majority opinion with respect to the Court's resolution of the fraud claim. I believe that the Court is substituting its judgment for the jury's regarding the weight of the evidence, particularly as to the element of reliance. The law is settled that our standard of review is a de novo assessment of the denial of Exxon's motion for a judgment as a matter of law ("JML"). That is, we consider de novo only the question whether the jury's verdict is supported by substantial evidence. Teague v. Adams, 638 So.2d 836, 837 (Ala.1994). As Exxon acknowledged in oral argument before this Court, the law is well settled that once we recognize that a jury verdict is supported by substantial evidence, we are bound to affirm the judgment entered on that verdict. Thus, our assessment of whether the verdict is supported by substantial evidence is properly guided by the following standard:
"`"`A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law.'" Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 510-11 (Ala. 2000), quoting Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997). In reviewing the denial of a motion *1135 for a judgment as a matter of law, this Court is required to view the evidence in a light most favorable to the nonmovant. Kmart Corp. v. Kyles, 723 So.2d 572, 573 (Ala.1998).'"
Wood v. Phillips, 849 So.2d 951, 957 (Ala. 2002) (quoting Liberty Nat'l Life Ins. Co. v. Daugherty, 840 So.2d 152, 156 (Ala. 2002)). See also Cochran v. Ward, 935 So.2d 1169 (Ala.2006); Thompson Props. 119 AA 370, Ltd. v. Birmingham Hide & Tallow Co., 897 So.2d 248 (Ala.2004); and Alabama Dep't of Transp. v. Land Energy, Ltd., 886 So.2d 787 (Ala.2004). Moreover, with respect to fraud, our deference to the jury as the finder of fact is heightened. Ballard v. Comm'r, 544 U.S. 40, 60, 125 S.Ct. 1270, 161 L.Ed.2d 227 (2005)(in which the United States Supreme Court reversed a decision of the United States Tax Court, noting that "[f]raud cases, in particular, may involve critical credibility assessments, rendering the appraisals of the [trier of fact] vital to the [reviewing court's] ultimate determination" and specifically criticizing the Tax Court's use of terms such as "vague" and "implausible" because such terms reflected a weighing of the evidence); Thompson Properties, supra (discussing this Court's deference to the jury's findings concerning intent to defraud in light of disputed evidence of the defendant's alleged fraudulent transfers of property); and Williams v. Williams, 786 So.2d 477, 480 (Ala.2000)(upholding the jury's verdict based upon promissory fraud and noting that this Court would "not reverse a judgment on a jury verdict on a weight-of-the-evidence basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was plainly and palpably wrong and unjust"). See also Franklin v. Cannon, 565 So.2d 119, 121 (Ala.1990) (discussing, in the context of reviewing a jury instruction, the jury's role as the sole arbiter of the credibility of witnesses).
With respect to the jury's verdict based on fraud, I understand the Court to be concluding that there is substantial evidence to support the following facts:[31]
1. At the time the leases were executed, Exxon understood its obligations under those leases and understood that it was obligated to pay royalties on the "gross proceeds" of the gas produced on the leased property; it was also aware of the clause in the leases that specifically provided that all ambiguities were to be construed in the State's favor.
2. Based on an economic assessment that indicated that it would gain millions of dollars, Exxon embarked on a plan to pay less royalties than it understood it owed the State under the terms of the leases.
3. As a part of its plan to pay less than it owed, Exxon prepared a pretextual basis for paying less, i.e., that it interpreted the leases differently than did the Alabama Department of Conservation and Natural Resources ("DCNR"), or that its method of calculating payments and deductions for expenses were the usual practice in the oil and gas industry. In Exxon's terminology, it would take an "aggressive" approach to interpreting the leases in its behalf.
4. Exxon supported the rationale for its plan to pay less than it owed by recognizing that DCNR's limited ability to audit the royalty payments would result in the failure to notice that incorrect royalty payment, or, in the event that it *1136 did notice any deficient royalty payments, DCNR would accept Exxon's pretextual reason for making the incorrect payment.
5. Exxon implemented its plan for adding to its gain by paying less royalties than it owed by first simply paying less royalties. However, when DCNR noticed discrepancies between the royalty payments it expected and the payments it received, Exxon advanced its pretextual reasons for the payments.
Thus, with respect to the elements of fraud,[32] I understand the Court to be agreeing that there is substantial evidence to support the conclusion that Exxon made false representations as to a material fact, i.e., it represented that the royalty payments it was making were in the correct amounts. On this point, it should be noted that the evidence supports the inference that Exxon was making two false representations of material facts: (1) that the royalty reports and payments were accurate, and (2) that the royalty reports and payments were made in good faith based upon what it believed it owed under the terms of the leases. I believe the record does contain substantial evidence indicating that Exxon at first simply made incorrect royalty payments pursuant to its overall plan of defrauding the State when it began making lease payments. However, when Nancy Cone became employed by the State in 1994 and requested reports on its royalty payments, Exxon continued to pursue its fraudulent scheme by providing those reports with the representation that the reports included cost-netting and deductions that it was taking pursuant to its good-faith interpretation of the leases. Thus, I believe there is substantial evidence to support the conclusion that although Exxon informed DCNR in February 1995 that it was not making the royalty payments DCNR would have expected, DCNR was still acting reasonably in relying on Exxon's representations that it was acting in good faith, i.e., that it was making its payments pursuant to a reasonable understanding of its obligations under the leases. Stated another way, the record contains substantial evidence to support the conclusion that Exxon's pretextual basis for paying royalties in a lesser amount was designed to deceive DCNR's auditing process. For example, the evidence supports a conclusion that Exxon, in dealing with Cone, disclosed the incorrect royalty payments accompanied by an explanatory report that falsely explained why those payments should be viewed as correct and further explained that Exxon was acting in a good-faith effort to comport with its obligations under the leases.
However, a majority of the Court would conclude that the record does not contain substantial evidence that DCNR relied to its detriment on Exxon's royalty reports and payments. More specifically, a majority of the Court concludes that, regardless of the evidence and as a matter of law, the State could not have relied to its detriment upon Exxon's representations because of DCNR's intent to audit and right to audit Exxon's royalty payments under the legal discussion set out in Hunt Petroleum Corp. v. State of Alabama, 901 So.2d 1 *1137 (Ala.2004). Thus, the Court substitutes its judgment for that of the jury.
With respect to evidence of the State's reliance on the payments and reports concerning the payments made by Exxon, which were the basis of DCNR's audits, I note a few examples from the record:
Testimony of Robert Macrory, at one time the chief legal counsel and the assistant commissioner for DCNR:
"Q. ... `[L]essee', which would be Exxon, `agrees to pay lessor,' the State, `royalty on the oil and gas produced on the above basis except no royalty shall be due for gas produced and flared for well-testing purposes.' Is that a material term in the lease?
"A. Yes.
"Q. And I want you to listen to one final, long quote from the [lease] form. `Each payment shall be accompanied by the affidavit of the lessee or lessee's authorized agent showing the gross amount of production, disposition, and the gross sales value or proceeds received of all oil, gas or other liquid or gaseous hydrocarbon mineral and their respective constituent products produced from the leased area or acreage pooled therewith.' Is that a material term of the lease?
"A. That's a very material term. We're relying on the information provided. We're relying on the correctness of the payments being made. And so it's very critical that this information be provided supporting thatthose payments."
Testimony of James Griggs, the director of the State Lands Division of DCNR:
"Q. I want to talk about how the Statefor a few minutes, how the State uses the information that it gets from these offshore producers. Can you explain to the jury how the State uses that information?
"A. Yes. What we do is whenwhen money is wired inand these royalties are of such magnitude that they're wired rather than receiving checks; we used to receive checksthen we capture the amount of royalty that's reported. We keep those values and those amounts, and prior to Nancy Cone, we would frequently be called on by the State Finance Director or the State Budget Officer to give us not only the historical figures for how much royalty was paid month by month, but what our projections were and, based on last year's revenues, what would bewhat would we anticipate in the coming years. And those figures would be used toas I understand it, by the budget office to project how much interest indirectly would come into the general fund and how much the general fund could depend on for future year budget continuing.
"Q. All right. Does the State rely on the information that Exxon and other producers give to be truthful and accurate?
"A. Yes. Wewe didn't look behind that for those particular projections or and we assumed they're accurate. I mean, it would be wrong to assume they were not accurate.
"Q. It would be wrong to assume they were false?
"A. Yes.
"Q. Even when doing the audit, it would be wrong to just take those reports and automatically assume they're false?
"A. Sure.
"Q. And did youafter your discussions with Mr. Kahn [business-analysis manager for Exxon] and Mr. Kartzke [Exxon's Mobile Bay project manager] *1138 and the clear meaning of the lease, did you presume that they were going to be reporting correctly?
"A. Yes.
"Q. And your department relied on that information; correct?
"A. Yes, we sure did.
"Q. And the State relied on those reports, did it not?
"A. Yes.
"Q. Just because the State was going to do an audit, Mr. Griggs, doesn't mean the State wasn't relying on these statements to be truthful, accurate, and fully disclosing what was going on?
"A. And complete, because we never knewour plan had been to audit every time period, and it still is to audit every time period. But we were not sureI think one of the earlier memos, I testified about as to why it took so long. We weren't sure we were going to be able to perform an audit for every period because we might not have the money to do it.
"Q. All right. And I believe we discussed audits don't catch everything and not everything is shown on the monthly report?
"A. No, they do not catch everything."
Testimony of Saul Solomon, a certified public accountant and certified fraud inspector hired by the State:
"Q. In the situation like this case, can you tell us, please, to what extent you have to rely on information that's given to you in order to do your review?
"A. Well, we're almost entirely dependent upon Exxon, in this case the operator, for information. I mean, they control the information; they have the documents. We have to rely upon what they give us. We have to rely upon what they tell us, and we are just we're basically at their mercy because we can't get the information from other sources generally. You know, we do get some information from the State regarding the payments that they received, but there's very little else we can get.
"Q. Without their cooperation?
"A. Without their cooperation. And it's really not proper for us to go to third parties, as an example, to get information in this type of review.
"Q. To what extent did you and your firm rely on information that was given to you by Exxon?
"A. We did rely. And we tried to test it by going back to the source documents. We relied on what they gave us and have utilized the information in all work.
"Q. What happens if you don't getor if you get incomplete or inaccurate information when you're attempting to do the type of work that you did in this case?
"A. It leads to double work, triple work sometimes, and it becomes very inefficient as well as creating just a lot of delay in terms of trying to get things completed.
"Q. Does it make it more expensive?
"A. It certainly makes it a lot more expensive.
"Q. Have you gotten everything that you need from Exxon in this case?
"A. No.
"Q. Exxon's lawyers have told the jury that the State had full access to all information during these audits. Is that true?
"A. That is not true.
"Q. He also stated that every document about cost-netting and everything else was available to the State. Is that true?

*1139 "A. That's absolutely false. We're still waiting to get information on cost-netting today.
"Q. He also stated that all questions were answered and all documents were produced. Is that correct?
"A. That is not correct, no."
The State cites numerous other instances of evidence showing that DCNR did rely on Exxon's representationsfirst, that its payment of royalties was what DCNR expected under the lease, at least until Cone was notified in February 1995 of Exxon's pretexts for cost-netting, and, after that notification, that its reports and royalty payments were made in good faith and not pursuant to a plan to deceive DCNR's audits. Moreover, I believe that the record contains substantial evidence indicating that the State relied to its detriment upon Exxon's representations that it was acting in good faith. In addition to the "double work, triple work" testified to by Solomon and the budget projections testified to by Griggs, the State presented other evidence of what it would have done and the damage it would have avoided had it known of Exxon's bad faith:
Testimony of Macrory:
"Q. Before I get to that, let me just ask you some specific questions. When you returned to the DepartmentI think you said February of '95?
"A. Yes.
"Q. did anybody from Exxon tell you that Exxon was taking deductions from gross proceeds before calculating the royalty?
"A. No.
"Q. Did anybody at Exxon tell you that they were using fuel for free?
"A. No.
"Q. If they had told you, what would have been your recommendation to the Commissioner?
"A. I would have said we need to audit Exxon now."
Testimony of Frank Snyder, in-house auditor for DCNR:
"Q. Now, can you tell us whether or notif Exxon were paying properly, whether or not you'd even need to do an audit?
"A. Well, you always need to do an audit. It would be probably a lot less time consuming and a lot less expensive.
"Q. You'd just be checking numbers to make sure the addition and subtraction or whatever was correct?
"A. You'd have to do an audit, but it would be less expensive, a lot less time
"Q. It wouldn't cost hundreds of thousands of dollars?
"A. I'd hope not.
"Q. If Exxon had fully explained in detail what [it was] doing, would you need to do an audit?
"A. Yes, but it would be far less time-consuming, far less expensive."
Testimony of Solomon:
"Q. All right. Now, correct me if I'm wrong. But in doing these extensive reviews and the time that you've talked about, I believe your firm has billed the State in this matterand I'm going to go down it by year. 1999, I think it was $2,626. In the year 2000, it was $466,266 or thereabouts. In 2001, it was about $279,000. In 2002, about $37,000. And then in 2003, about [$815,000]. Can you tell us, please, why it was so large in the year 2003?
"A. Yes. Basically, weyou know, we've been continuing to get information from Exxon over the three or four yearsfour and a half years actually. But there were calculations that were made earlier on that had been superseded *1140 and basically redone to a large extent. This year, in 2003, we continued to get information from Exxon on expenses and on new information concerning the last three years, which is all part of the 2003 billing. The royalty audit work that was done for this three-year time period is included in there. And getting ready for this trial, depositions and so forth and getting exhibits together, it was a lot of work to do. And, basically, we had to go back in and redo a lot of what had been done previously because of new information, changed assumptions, and things of that nature.
"Q. All right. Again, that doesn't directly go to you or any of the other 26 people that have worked on it?
"A. No. It's a very extensive process. There's a lot of documents. There's a lot of information to weed through and to understand. And it's justit's very time-consuming.
"Q. Can you tell us basically what the average hourly charge has been based on the number of hours in the billing?
"A. Yes. It's about $150 an hour on average.
"Q. Now, is what you've done and your billings to the State, is that in line with any other reviews that you're aware of?
"A. Well, yes. I'm aware that another accounting firm, Ernst andwell, Ernst & Ernst had reviewed the work that we had done at one point in time for about a two- to three-month time period, and they spent 2,000 hours just reviewing the work we had done through that time period. So in that very short window of time, having all of our documents as a guide, they just basically went through and reviewed what we did. Basically, what's in those binders that's in front of you, we've spent 2,000 hours in doing, which was, you know, approximately 20 percent of the entire amount of the time that we've spent in four and a half years. So I think it's in line.
"Q. So do youwhat approximately would the billing have been for that?
"A. Well, I know what their billing rates average, and it would be about five to six hundred thousand dollars.
"Q. Now, is what you've done in this case in the billing to the State of Alabama, is it in line with other reviews or audits you've done for other clients?
"A. Yes. We've done, as I said before, fifteen or so of these royalty reviews for litigation like this, and it's very time-consuming."
I recognize that the record contains evidence that could support a different conclusion, perhaps a conclusion that Exxon was simply acting to maximize its profits without any overt plan of deception. However, I am clear that our standard of review does not permit us to weigh the evidence.
"`A strong presumption of correctness attaches to a jury verdict in Alabama, if the verdict passes the "sufficiency test" presented by motions for [a JML and a renewed motion for a JML]. This presumption of correctness is further strengthened by a trial court's denial of a motion for new trial.'"
Tolar Constr., LLC v. Kean Elec. Co., 944 So.2d 138, 144 (Ala.2006)(quoting Carter v. Henderson, 598 So.2d 1350, 1354 (Ala. 1992) (citations omitted)). See also Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330 (Ala.2006). In fact, "`[t]his Court will not reverse a judgment based on a jury verdict on the ground that the evidence was insufficient unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was "plainly and palpably wrong and unjust."'" Tolar, 944 So.2d at 144-45 (quoting Carter, 598 So.2d at 1354 (emphasis *1141 added)). Once this Court ascertains that the record contains substantial evidence of reliance and detriment resulting from that reliance, our duty is to affirm the judgment entered on the jury's verdict with respect to fraud, subject to an assessment of the propriety of the awards of compensatory and punitive damages.
I would conclude that the testimony quoted above constitutes substantial evidence supporting the conclusions (1) that the State relied upon Exxon's representations that it was acting in good faith in the payment of its royalties, (2) that had DCNR known that Exxon was acting pursuant to a fraudulent scheme it would have, at a minimum, immediately implemented the stringent auditing procedures that it was forced to implement much later and thereby would have saved hundreds of thousands of dollars in redoing work that had already been done using Exxon's false representations. I believe that this evidence also supports the conclusion that had Exxon not deceived DCNR into relying on its representation that it was acting under a good-faith interpretation of the leases, the State would have brought legal action much sooner, thereby reducing litigation costs and recovering the "time value" of its money as discussed in the oral argument of this case.
I respectfully submit that Exxon has been able to confuse two facts: (1) that it notified DCNR that it was making various deductions and cost-netting so that DCNR could no longer rely on the representation that it was making royalty payments based purely on gross proceeds, and (2) that it was not acting in good faith and that the payments it reported were based on a pretext meant to deceive DCNR. Moreover, the fact that Exxon was the sole source of information concerning the nature and quantity of the gas on which it calculated royalties makes the State's reliance on Exxon's good faith reasonable, a fact that settled authority recognizes as compelling in assessing detrimental reliance. Earle, McMillan & Niemeyer, Inc. v. Dekle, 418 So.2d 97, 100 (Ala.1982); Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 281 So.2d 636 (1973); and Williams v. Bedenbaugh, 215 Ala. 200, 110 So. 286 (1926).
At the least, the determination of the reasonableness of the State's reliance under these circumstances is a question of fact for the jury. See, e.g., Ex parte Alabama Farmers Coop., Inc., 911 So.2d 696 (Ala.2004)(genuine issue of material fact existed as to whether corporation had reasonably relied on audit report showing that it had no obligations under unauthorized long-term leases, so that corporation did not have notice that auditor had improperly disregarded effect of leases until corporation was sued, thus precluding summary judgment for the auditor, based on statute of limitations); Alfa Mut. Fire Ins. Co. v. Thomas, 738 So.2d 815 (Ala.1999); AT&T Info. Sys., Inc. v. Cobb Pontiac-Cadillac, Inc., 553 So.2d 529, 532 (Ala.1989); Liberty Nat'l Life Ins. Co. v. Sherrill, 551 So.2d 272 (Ala.1989); Southern Life & Health Ins. Co. v. Smith, 518 So.2d 77 (Ala.1987); and George v. Nevett, 462 So.2d 728 (Ala. 1984). Cf. Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997).[33]
Moreover, it is the settled law that in our review of the jury's findings of facts regarding the State's reliance we must *1142 "construe most favorably to [the State, as the party favored by the jury's verdict,] the facts and any reasonable inferences the jury could have drawn." Harrelson v. R.J., 882 So.2d 317, 321 (Ala.2003). See also Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801 (Ala.2003), and Dunlop Tire Corp. v. Allen, 725 So.2d 960 (Ala. 1998). With respect to the evidence indicating that the State did rely on Exxon's representations that it was acting on a good-faith interpretation of the leases, it defies common sense for this Court to hold that the jury could not reasonably infer that the fact that Exxon was hiding its fraudulent plan from DCNR was not valuable to DCNR and that DCNR did not lose time and money during the period Exxon was successful in hiding its fraudulent plan. Who among us would reasonably contend that there is no value in knowing that the party that you are dealing with in a multi-million-dollar transaction is not acting in good faith?
However, in light of the prior ruling of this Court in Hunt Petroleum Corp., supra, the majority appears willing to hold that the State presented no evidence that it reasonably relied on Exxon's fraud because DCNR had the ability to audit Exxon's royalty payments. In my view, this belief is based on a willingness to disregard the State's evidence of detrimental reliance by improperly weighing that evidence in contravention of the applicable standard of review. I respectfully disagree with the application of the Hunt standard to the scenario presented by this case. Initially, I note that the evidence now before this Court is qualitatively and quantitatively different from the evidence before the Court in Hunt. In Hunt, the Court determined that one incident of testimony to the effect that the State "assumed" that the defendant's royalty payments were accurate was not sufficient to establish detrimental reliance in light of the State's authority and intent to audit those royalty payments.
There is no need to quibble with whether the Court's review in Hunt improperly disregarded substantial evidence, in light of the numerous incidents of specific evidence presented by the State in this case. Some of that evidence has already been noted in this writing, and it shows that the State did rely on Exxon's royalty payments and reports as being (1) an accurate accounting of amounts due under the leases, and (2) a good-faith rendition of what Exxon believed it owed under the leases. Even if DCNR had reason to suspect that it was at variance with Exxon over the amount of royalties to be paid when Cone was notified of the reports, the evidence that the State was entitled to rely on Exxon's representation that it was acting in good faith is still substantial. Unlike the evidence in Hunt, here the State has presented specific evidence that it did rely on Exxon's representations and that it did suffer loss as a result of that reliance.
The gist of the Court's holding today is that the fact that DCNR had the right to audit Exxon's royalty payments and had expressed an intent to do so means that the State could not have reasonably relied on Exxon's representations that it was making accurate royalty payments and reports and that it was doing so in good faith. The existence of DCNR's right to audit was the basis for the Court's distinction of Braswell v. ConAgra, Inc., 936 F.2d 1169 (11th Cir.1991).[34] In that case, *1143 the United States Court of Appeals for the Eleventh Circuit applied Alabama law to review ConAgra's appeal from a judgment on a jury verdict awarding damages to the plaintiff chicken growers. The growers were compensated based on the weight of the chickens, and they sued ConAgra alleging both fraud and breach of contract and asserting that ConAgra had made insufficient payments resulting from purposefully inaccurate weighing methods. In considering the plaintiffs' proof of detrimental reliance, the court in Braswell concluded that the fact that the plaintiffs accepted ConAgra's payments when ConAgra was in control of the weighing process constituted sufficient proof of reliance. In Hunt, the Court distinguished Braswell on the basis that the defendant oil company was subject to the State's audits and was not, therefore, in total control of the payment process. In Hunt, unlike this case, there was no apparent evidence indicating that the defendant oil company was in control of the information on which the royalty payments were based.
In this case, there is overwhelming evidence that Exxon was in complete control of the information on which the royalty payments and reports were based. This Court long ago recognized:
"`[M]isrepresentations often cause the person to whom they are addressed not to use the means of knowledge within his power. The modern tendency is certainly toward the doctrine that negligence in trusting in a misrepresentation will not excuse positive willful fraud, or deprive the defrauded person of his remedy. Especially where there is a relation of natural trust and confidence, though not strictly a fiduciary relation, the failure of the defrauded party to exercise vigilance will not deprive him of redress. And so it is where one party has peculiar or superior knowledge of the facts which enhance the reliability of his statements. Nor does the fact that the representation concerns a matter of public record exonerate the defrauder from liability.' Williston on Contracts, Rev. Ed., (1937) Vol. 5, Sec. 1516."
Bank of Loretto v. Bobo, 37 Ala.App. 139, 149, 67 So.2d 77, 86 (1953). Moreover, there is also substantial evidence in this case showing that Exxon exerted that control with an aim toward deceiving DCNR's auditing process. Thus, the factor for determining reliance in Braswell, i.e., that the plaintiff accepted the payments,[35] should also be a factor in determining reliance in this case, particularly based upon the direct evidence presented by the State.
The dispositive factor, however, in any evidentiary appellate analysis is that this Court is limited in its review to determining whether the State presented substantial evidence of reliance. Wood, Cochran, and Thompson Properties, supra. Certainly DCNR's ability to audit is one consideration in determining reliance, as are the facts that the State accepted payments, and, for awhile, accepted Exxon's representation that its payments and reports were made based upon a good-faith interpretation of the leases. The fact that the State presented direct testimony by several individuals involved in the leases and in the auditing process to the effect that it had relied upon Exxon's representations *1144 and that it had incurred substantial costs and lost substantial rights to earlier contractual and legal remedies are also factors to be considered. However, that consideration is for the jury, and this Court is obligated to affirm the judgment based on the jury's determination once it concludes that the verdict is supported by substantial evidence. Thus, the references to what constitutes "sufficient" evidence set out in the opinion are entirely contrary to the long-settled precedent of this Court to the effect that the trier of fact, in this case the jury, determines credibility with regard to the sufficiency of the evidence. Moreover, none of the contentions in the majority opinion adequately addresses the evidence in this case showing that Exxon represented that it was acting in good faith, a representation upon which the State relied to its considerable detriment.
If the evidence presented in this case is disregarded as not substantial evidence of detrimental reliance in light of DCNR's statement of its intent to audit, I cannot envision a scenario in which the State could have shown reasonable reliance. The majority's application of Hunt in this case amounts to a holding, as a matter of law, that an intent to exercise a right to audit defeats any showing of reliance, thus defeating a fraud claim. Such a position is not the law in any state, and courts in other jurisdictions have soundly reflected contentions to that effect. See, e.g., United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 456 (6th Cir.2005)(noting that governmental audit procedures exist "as an administrative mechanism to make `necessary adjustments due to previously made overpayments or underpayments' not as a remedial mechanism for fraud" (quoting 42 C.F.R. § 413.64(f)(1))). See also Morrill v. Becton, Dickinson & Co., 747 F.2d 1217 (8th Cir.1984); Gregory v. Chemical Waste Mgmt., Inc., 38 F.Supp.2d 598 (W.D.Tenn. 1996); Johns Hopkins Hosp. v. Peabody Coal Co., 920 F.Supp. 738 (W.D.Ky.1996); Caterpillar, Inc. v. Jerryco Footwear, Inc., 880 F.Supp. 578, 589 (C.D.Ill.1994); Atlantic Richfield Co. v. Lujan, 811 F.Supp. 1520 (N.D.Okla.1992); SEECO, Inc. v. Hales, 341 Ark. 673, 697, 22 S.W.3d 157, 172 (2000); and Reis v. Peabody Coal Co., 997 S.W.2d 49 (Mo.Ct.App.1999). Thus, a holding that the Hunt rationale concerning the State's ability to audit is dispositive on the factual issue of the State's detrimental reliance not only disregards the settled law of this State regarding the ambit of appellate review, but it also enacts a doctrine that will be unique in the United States and that is uniquely favorable to Exxon.
Finally, I am very concerned that this Court would make a presentation that effectively concludes that a thoughtful plan of fraud and deceit designed for pure economic benefit should prevail over long-settled rules requiring integrity and good faith in the conduct of business. Certainly, with respect to every contract in which a party to the contract has an opportunity to review the other party's compliance with the terms of the contract, the majority opinion is precedent for a rule that actively encourages individuals and companies to commit fraud for financial gain. I believe that this is fundamentally wrong, both ethically and economically. As one of the Justices of this Court once wrote:
"Engaging in fraud ... or actively misleading not only produces a need for compensation, it also undermines the foundation of the legal-economic structure in such a way that we cannot even guess the degree to which the system fails to operate efficiently."
Harold See, Punitive Damages: A Supporting Theory, 40 Ala. L.Rev. 1227, 1234 (1989).
*1145 The opinion today disregards the long-settled precedent of this Court and substitutes itself for the jury so that it can make conclusions based on the credibility of witnesses and the weight of the evidence. The majority contrives this substitution for the purpose of holding blameless a practice that everyone acknowledges was deceitful and based on a rationale designed to maximize corporate profits by underpaying the agreed-upon price for the resources of the State of Alabama. Not only does the majority opinion approve of the appropriation of this State's resources by deceit, it undermines any individual or institution that would pursue honest business practices. This is neither legal nor just. I therefore dissent.
NOTES
[1] The letter bears a date of February 4, 1996, on the first page; the second page is dated February 4, 1997. Inasmuch as the letter demanded moneys as the result of the audit, it is highly probable that the actual date of the letter was February 4, 1997, after the initial audit was completed.
[2] In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), this Court set out principles to be used by a trial court for analyzing a jury award for excessiveness.
[3] The trial transcript totals 3,812 pages in 34 volumes; the clerk's record totals 2,364 pages. One hundred ninety-nine exhibits were admitted during the trial.
[4] The jury verdict form incorporated into the judgment of the trial court showed a total of $63,592,647; the sum of the individual awards, however, equals $63,769,568.
[5] The judgment amount reflects the $63,592,647 amount entered on the verdict form, and not the sum of the compensatory awards of $63,769,568. See note 4.
[6] "Spudding in" is "the first boring of the hole in the drilling of an oil well." Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 933 (7th ed.1987).
[7] In closing argument, the State directed the jury's attention to an exhibit in evidence that gave the figure of $23,449,186 as the "alleged unpaid royalty" portion of the contract "damages before March 1997," the period covered by the State's first audit. Although this amount is purportedly attributable to fraud, it is actually a part of, and included in, the total compensatory-damages award shown above.
[8] The tests from which the estimates are made are generally run on a monthly basis, usually for a period of several hours, producing a snapshot in time of what is being produced in a given well.
[9] The "tailgate" is "[t]he delivery point for residue gas after processing and removal of liquid constituents in a processing plant." Manual of Oil and Gas Terms 975.
[10] We find no explanation in the record for the anomaly of how sweet gas is obtained from a field that produces only sour gas.
[11] Solomon, a partner in the accounting firm of Mann, Frankfort, Stein & Lipp, L.P., was retained in June 1999 to conduct audits on 111 months of payments from Exxon.
[12] Borden, a certified public accountant, is chairman of Aldridge, Borden and Company, the accounting firm hired to analyze the documents analyzed by Solomon and to analyze Solomon's findings.
[13] The AOGB monitors oil and gas production in Alabama to ensure that Alabama's oil and gas resources are not wasted and that both the environment and the rights of mineral owners are protected. It issues a permit for each well drilled and approves the infrastructure of the operation and the metering at the various measurement points to ensure that gas is measured in a way that protects the royalty owner.
[14] See supra note 6.
[15] Testimony of George C. Hite on direct examination by the State. We note that condensate is also variously defined as: "liquid hydrocarbons recovered from a condensate gas reservoir. Typical condensates grade from colorless liquids ... to light-colored liquids of red, green or blue cast.... Some ... are indistinguishable from ... light crude oil, ... liquid hydrocarbons recovered at the surface that result from condensation due to reduced temperature or pressure of petroleum hydrocarbons existing initially in a gaseous phase in the reservoir.... [and] as a mixture mainly of pentanes and heavier hydrocarbons that may be contaminated with sulfur compounds...." Manual of Oil and Gas Terms 171-72.
[16] Testimony of Professor David Pierce of the Washburn School of Law at Topeka, Kansas, an expert witness for Exxon, on direct examination.
[17] Both parties seem to accept the misnomer of "condensate" for the product under discussion; no one argued that the product does not meet the definition of condensate or that the leases may have contemplated an entirely different product.
[18] Ordinarily, intent is not an element of a fraud claim. § 6-5-101, Ala.Code 1975 ("Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.").
[19] This is the same Robert Macrory who was chief legal counsel for DCNR when he redrafted the standard lease form.
[20] Paragraph 24 provides a procedure under which a breach of the leases on Exxon's part may result in the forfeiture by Exxon of all rights under the lease and in the area being leased to another operator by the State. One of the reasons justifying these forfeiture proceedings is the making of "any false return or false report concerning operations or production...."
[21] Paragraph 5(a) states that

"if any oil or gas is produced from any well drilled, whether or not sold or used off the leased area, LESSEE agrees to pay to LESSOR royalty on the oil or gas produced on the above basis, except that no royalty shall be due for gas produced and flared for well testing purposes."
Paragraph 5(d) states:
"Notwithstanding anything contained herein to the contrary ... LESSEE may recycle gas for gas lift purposes on the leased area or for injection into any oil or gas producing formation underlying the leased area after the liquid hydrocarbons contained in the gas have been removed and no royalty shall be payable on the gas so recycled until such time as the same may thereafter be produced or sold or used in such manner as to entitle LESSOR to a royalty thereon under the royalty provisions of this lease."
[22] I agree that Sheffield does not control the disposition of this case. In that case, the Court emphasized that the determination is fact specific and that a lease could define what constitutes drilling. Further, the contract at issue in Sheffield apparently did not contain a provision requiring a construction in favor of the lessor when there is ambiguity.
[23] Cone was the only DCNR employee to look at these reports before the audits, but she testified that it was not her job responsibility to review the reports to determine whether Exxon was paying in accordance with the leases. Instead, Cone testified that she merely input into a spreadsheet the same figures Exxon had provided in the reports. Cone simply "match[ed] up an individual payment... with individual leases."
[24] Chief Justice Cobb cites an article I wrote in 1989, Punitive Damages: A Supporting Theory, 40 Ala. L.Rev. 1227, 1235 (1989), for the proposition that "a rule that actively encourages individuals and companies to commit fraud for financial gain ... is fundamentally wrong, both ethically and economically." I stand by this article. In the article, I emphasized that it is the defendant's active suppression or misrepresentation that justifies an award of punitive damages because, when a defendant has actively suppressed or misrepresented material facts, the legal system cannot operate efficiently, being deprived of the information necessary for determining the proper level of compensation. That principle, however, does not justify the award of punitive damages in this case, which is devoid of substantial evidence of misrepresentation or suppression.

The State argues that Exxon was aware of the State's interpretation of the leases, but did not inform the State that it interpreted the leases differently. Although this may be evidence of a dispute over contract terms, absent legally recognized misrepresentation or suppression by Exxon, there is no actionable fraud. The legal system can operate efficiently when the information needed to determine the damages required to compensate for any breach of contract is available.
The State fails to produce substantial evidence of a misrepresentation and of its reliance on that misrepresentation. Our punitive-damages statute requires not only a showing of fraud, but also that the fraud claim be supported by clear and convincing evidence. That there is not substantial evidence of fraud necessarily means that there is not clear and convincing evidence of fraud to support an award of punitive damages.
[25] In his memorandum to Lyons, Martin stated that "a decision was made not to audit any more revenues generated from offshore leases that processed natural gas through treatment plants until the natural gas plant audit expert was on board. Only Jim Griggs has the answer to the question of why it took from April of 1993 until the summer of 1995 to complete the search for the appropriate natural gas plant audit consultant." Martin further stated that the "delay in selecting a natural gas plant audit consultant [was] []not the fault of any oil and gas company."
[26] Indeed, as noted above, DCNR was on notice that Exxon was taking deductions from the "gross proceeds" as early as December 1994.
[27] Criminal proceedings are the traditional setting in which the State pays the prosecutors, the judges, and the jurors with the goal and expectation of dispensing impartial justice. But, in that typical scenario to which we are very well accustomed, the State has no enormous economic upside, as is the case here.
[28] Chief Justice Cobb's special writing, dissenting in part from the fraud section of the main opinion, repeatedly refers to the obligation to act in good faith and Exxon's failure to conform to that standard and even refers to Exxon's bad faith. However, because of the absence of a tort remedy for bad-faith breach of an oil and gas contract, such observations do not justify affirming that aspect of the judgment awarding punitive damages.
[29] Chief Justice Cobb states in her special writing: "Thus, with respect to the elements of fraud, I understand the Court to be agreeing that there is substantial evidence to support the conclusion that Exxon made false representations as to a material fact, i.e., it represented that the royalty payments it was making were in the correct amounts." 986 So.2d at 1136 (Cobb, C.J., concurring in part and dissenting in part). I respectfully disagree, because I do not consider an aggressive interpretation of the legal effect of a contract, unaccompanied by any misstatement of any underlying fact and under circumstances where all underlying facts are available to the other party to the contract, to constitute "false representations as to a material fact." In the context of fraud in events leading to the formation of a contract, this Court observed in Anderson v. Ashby, 873 So.2d 168, 181-82 (Ala.2003) (quoting Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777, 783 n. 6 (Ala.2000)):

"`See Rutter & Hendrix v. Hanover Fire Ins. Co., 138 Ala. 202, 215, 35 So. 33, 37 (1903): ("`[A]ll our decisions hold, that in the absence of a relation of trust and confidence, or of some other peculiar fact or circumstance, a misrepresentation of [a] matter of law, or of [a] matter of judgment equally open to the observation or inquiries of both parties, or of mere opinion, will not vitiate a contract.'... `[A] misrepresentation of the legal effect of a written instrument was, from its very nature, but the expression of an opinion upon a question of law, equally open to the observation and inquiries of both parties, and as to which, the law presumes that the party to whom it was made had knowledge.'") ([quoting Georgia Home Ins. Co. v. Warten, 113 Ala. 479, 486-87, 22 So. 288, 290 (1897); other] citations omitted); see also Restatement (Second) of Contract § 164 & cmt. b, illus. 2 & 3 (1981).'"
I see no basis to apply a different standard to parties in a contractual relationship whose activities require periodic conduct consistent with their agreement.
[30] According to the official Web site of the Rotary Club, www.rotary.org, Rotarian Herbert J. Taylor created the 4-Way Test, a code of ethics, in 1932. The Rotary Club adopted it in 1943. The 4-Way Test asks the following questions:

"Of the things we think, say or do
"1. Is it the Truth?
"2. Is it Fair to all concerned?
"3. Will it build Goodwill and Better Friendships?
"4. Will it be Beneficial to all concerned?"
(On the date this opinion was released, this information could be accessed online at: www.rotary.org/en/AboutUs/Rotary International/History/Pages/ridefault.aspx.)
[31] The evidence for these conclusions is exemplified in the "Condray documents." For a description of those documents, see Exxon Corp. v. Department of Conservation & Natural Resources, 859 So.2d 1096, 1106 n. 2 (Ala. 2002). I believe that the expert testimony of Saul Solomon is also relevant.
[32] Fraud, as defined in § 6-5-101, Ala.Code 1975, includes four elements: (1) There must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result. However, fraud may also be committed by the suppression of material facts, pursuant to § 6-5-102. Drummond Co. v. Walter Indus., Inc., 962 So.2d 753 (Ala.2006); Cowen v. M.S. Enters., Inc., 642 So.2d 453 (Ala.1994); and Jewell v. Seaboard Indus., Inc., 667 So.2d 653 (Ala. 1995).
[33] As an analogy, the case of Kelly v. Connecticut Mutual Life Insurance Co., 628 So.2d 454 (Ala. 1993), may be helpful. In that case, the Court recognized that the limitations period for a fraud action would be tolled when a party is put on notice of possible fraud and makes an inquiry that produces an answer that is reasonably relied upon to allay the suspicion of fraud.
[34] The Court also noted a distinction from Braswell based upon the fact that the court in Braswell was applying the "justifiable" reliance standard rather than the "reasonable" reliance standard. Because this Court is presently engaged in determining whether there was substantial evidence of any reliance, I do not view the distinction between "justifiable" reliance and "reasonable" reliance as a meaningful basis for distinction.
[35] Courts addressing similar situations have consistently held that the reliance element of actionable fraud is satisfied when the plaintiff accepts payments in reliance upon representations that intentionally understate the amount of royalties due. See, e.g., Reis v. Peabody Coal Co., 997 S.W.2d 49 (Mo.Ct.App. 1999).